**BRYAN CAVE LEIGHTON PAISNER LLP**
Sharon Z. Weiss (State Bar No.: 169446)
sharon.weiss@bclplaw.com
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Jarret P. Hitchings (*Admitted Pro Hac Vice*)
jarret.hitchings@bclplaw.com
One Wells Fargo Center
301 S. College Street, Suite 2150
Charlotte, NC 28202
Telephone: (704) 749-8999
Facsimile: (704) 749-8990

*Attorneys for Debtor and Debtor in Possession*

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:24-bk-11057-DS |
| Oceanwide Plaza LLC, | Chapter 11 |
| Debtor. | **DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION (DATED SEPTEMBER 5, 2024)** |
| | Disclosure Statement Hearing<br>Date:  September 5, 2024<br>Time:  1:00 p.m.<br>Place: Ctrm 1634/Via Zoom<br>       255 East Temple Street<br>       Los Angeles, CA 90012 |
| | Plan Confirmation Hearing<br>Date:  October 16, 2024<br>Time:  10:00 a.m.<br>Place: Ctrm 1634/Via Zoom<br>       255 East Temple Street<br>       Los Angeles, CA 90012 |

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

## **TABLE OF CONTENTS**

**Page**

Table of Authorities ................................................................................................................. iii

DISCLAIMER ........................................................................................................................... 1

I.      INTRODUCTION .......................................................................................................... 2

II.     BACKGROUND ............................................................................................................ 4

    A.      Description and History of Debtor's Business and a Summary of the
    Circumstances Which Led to the Filing of this Case. .......................................... 4

        Debtor's Business Operations ................................................................................. 4

        Debtor's Liquidity Struggles and Pre-Petition Efforts to Reorganize ................. 6

        The Webcor Litigation .......................................................................................... 7

        Debtor Is Working With LA City As A Result of International Attention
        Causing Security Issues ......................................................................................... 8

    B.      Pre-Petition Financing Arrangements .................................................................. 9

    C.      Events During Debtor's Chapter 11 Case. .......................................................... 10

        a.      Employment of Professionals and Consultants ...................................... 10

        b.      Claims Bar Date ...................................................................................... 10

        c.      Summary of Scheduled and Filed Claims .............................................. 11

            i.      Secured Claims ........................................................................... 11

            ii.     Priority Tax Claims .................................................................... 11

            iii.    Non-Tax Priority Claims ............................................................ 11

            iv.     General Unsecured Claims .......................................................... 11

            v.      Intercompany Loans ................................................................... 11

        d.      DIP Financing ......................................................................................... 12

        e.      Limited Relief from Stay Regarding the State Court Action ................. 13

        f.      U.S. Trustee's Motion to Dismiss Denied ............................................. 14

        g.      Settlement-Efforts / Mediation With Consulting Parties ....................... 14

        h.      Bidding Procedures / Sale of Property ................................................... 14

III.    PLAN SUMMARY ....................................................................................................... 16

IV.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. ............. 19

    A.      What Creditors and Interest Holders Will Receive Under the Plan. ................... 19

    B.      Unclassified Claims. ........................................................................................... 20

        1.      DIP Facility Claims. ............................................................................... 20

        2.      Administrative Claims. ........................................................................... 20

        3.      Professional Fee Claims. ......................................................................... 21

        4.      Priority Tax Claims. ................................................................................ 21

        5.      Statutory Fees. ........................................................................................ 22

    C.      Means of Effectuating and Implementing the Plan. ........................................... 22

        1.      Funding for the Plan. .............................................................................. 22

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

|  |  | 2. | Sale of the Property. | 22 |
|  |  | 3. | Liquidation of Plan Administration Assets. | 22 |
|  |  | 4. | Transfer to the Liquidating Trust. | 23 |
|  |  | 5. | Causes of Action. | 23 |
|  |  | 6. | Composition of Debtor Post-Confirmation. | 24 |
|  |  | 7. | Distribution Agent. | 24 |
|  |  | 8. | Employment of Professionals by the Liquidating Trustee. | 24 |
|  |  | 9. | Protocol for the Liquidation of Disputed Claims. | 24 |
|  |  | 10. | Exemption from Transfer Taxes. | 26 |
|  |  | 11. | Distributions to Be Made Pursuant to the Plan. | 26 |
|  |  | 12. | Injunctions. | 27 |
|  |  | 13. | Exculpation. | 28 |
|  |  | 14. | Executory Contracts and Unexpired Leases. | 28 |
|  |  | 15. | Retention of Jurisdiction. | 31 |
| V. | TAX CONSEQUENCES OF THE PLAN. |  |  | 34 |
| VI. | CONFIRMATION REQUIREMENTS AND PROCEDURES. |  |  | 35 |
|  | A. | Who May Object. |  | 35 |
|  | B. | Who May Vote to Accept or Reject the Plan. |  | 35 |
|  | C. | What is an Allowed Claim or Interest? |  | 35 |
|  | D. | What is an Impaired Claim or Interest? |  | 36 |
|  | E. | Who is Not Entitled to Vote. |  | 36 |
|  | F. | Who Can Vote in More Than One Class. |  | 36 |
|  | G. | Votes Necessary to Confirm the Plan. |  | 37 |
|  | H. | Votes Necessary for a Class to Accept the Plan. |  | 37 |
|  | I. | Treatment of Non-Accepting Classes. |  | 37 |
|  | J. | Liquidation Analysis. |  | 37 |
|  | K. | Feasibility. |  | 39 |
| VII. | RISK FACTORS REGARDING THE PLAN. |  |  | 40 |
| VIII. | EFFECT OF CONFIRMATION OF THE PLAN. |  |  | 41 |
|  | A. | Discharge. |  | 41 |
|  | B. | Modification of the Plan. |  | 41 |
|  | C. | Post-Confirmation Status Reports. |  | 41 |
|  | D. | Post-Confirmation Conversion/Dismissal. |  | 41 |
|  | E. | Final Decree. |  | 42 |

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
  554 U.S. 33 S. Ct. 2326, 171 L. Ed. 2d 203 (2008) ............................................................ 27

*In re New 118th, Inc.*,
  398 B.R. 791 (Bankr. S.D.N.Y. 2009) .............................................................................. 27

**Statutes**

11 U.S.C. § 105 ...................................................................................................... 2, 31

11 U.S.C. § 326 ........................................................................................................... 37

11 U.S.C. § 346 ........................................................................................................... 31

11 U.S.C. § 362 ........................................................................................................... 13

11 U.S.C. § 363 ........................................................................................................... 31

11 U.S.C. § 365(d)(4) .................................................................................................. 32

11 U.S.C. § 502(d) ...................................................................................................... 31

11 U.S.C. § 505 ........................................................................................................... 31

11 U.S.C. § 507(a)(2) ............................................................................................. 23, 35

11 U.S.C. § 507(a)(3) .................................................................................................. 35

11 U.S.C. § 507(a)(8) ............................................................................................. 24, 35

11 U.S.C. § 542 ........................................................................................................... 31

11 U.S.C. § 551 ........................................................................................................... 31

11 U.S.C. § 553 ........................................................................................................... 31

11 U.S.C. § 1112(b) .............................................................................................. 13, 40

11 U.S.C. § 1123 ......................................................................................................... 31

11 U.S.C. § 1123(a)(1) ................................................................................................ 16

11 U.S.C. § 1125 ........................................................................................................... 2

11 U.S.C. § 1129 ........................................................................................................... 3

Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

11 U.S.C. § 1129(a)(8) .................................................................................................. 36

11 U.S.C. § 1129(a)(9)(C) ........................................................................................ 24, 27

11 U.S.C. § 1129(b) .................................................................................................... 36

11 U.S.C. § 1141 ......................................................................................................... 31

11 U.S.C. § 1146 ......................................................................................................... 31

11 U.S.C. § 1146(a) .......................................................................................... 27, 31, 37

28 U.S.C. § 1930(a) .................................................................................................... 24

28 U.S.C. § 1930(a)(6) ............................................................................................... 41

31 U.S.C. § 3717 ......................................................................................................... 24

Cal. Civ. Code § 8800 .................................................................................................. 7

Cal. Rev. & Tax. Code §11911 ................................................................................... 27

Cal. Rev. & Tax. Code § 11923 ............................................................................ 27, 37

LAMC § 21.9.2(a) ...................................................................................................... 27

LAMC § 21.9.2(b) ...................................................................................................... 27

LAMC § 21.9.6 .................................................................................................... 27, 37

**Other Authorities**

Fed. R. Bankr. P. 3019 .................................................................................................. 4

Fed. R. Bankr. P. 3022 ................................................................................................ 40

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

1

# **DISCLAIMER**

2  THIS THIRD AMENDED DISCLOSURE STATEMENT[1] (THE "DISCLOSURE

3  STATEMENT") WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS

4  SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF DEBTOR'S KNOWLEDGE,

5  INFORMATION, AND BELIEF. THERE HAS BEEN NO INDEPENDENT AUDIT OF THE

6  FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT

7  AS EXPRESSLY INDICATED HEREIN.

8  NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS, AND IS

9  NOT INTENDED TO BE, AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY

10  OR TO BE ADMISSIBLE IN ANY PROCEEDING INVOLVING DEBTOR OR ANY OTHER

11  PARTY, OR TO BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL

12  EFFECTS OF THE PLAN ON DEBTOR OR HOLDERS OF CLAIMS OR EQUITY

13  INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE

14  FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN

15  BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

16  UNLESS OTHERWISE INDICATED HEREIN, THE STATEMENTS CONTAINED

17  HEREIN ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE

18  STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY

19  IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY

20  TIME AFTER THE DATE HEREOF.

21  HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE

22  CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL,

23  BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD

24  CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO

25

26

27

28

---

[1] Debtor filed its initial Disclosure Statement on July 10, 2024 [ECF No. 328], its Supplement to its Disclosure Statement on August 19, 2024 [ECF 387], and its Second Amended Disclosure Statement on September 4, 2024 [ECF 431]. This Third Amended Disclosure Statement is filed as of September 5, 2024 and includes additional information not available at the time of filing the initial Disclosure Statement, the Supplement to the Disclosure Statement, and the Second Amended Disclosure Statement.  In order to provide information in one document, this Supplement replaces the initial Disclosure Statement, Supplemental Disclosure Statement, and Second Amended Disclosure Statement.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS DISCLOSURE STATEMENT OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR EQUITY INTEREST. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b), AND NOT IN ACCORDANCE WITH FEDERAL, OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. SEE SECTION VII BELOW, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED" FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN'S CONSIDERATION.

## I.    **INTRODUCTION**

Debtor Oceanwide Plaza LLC (the "Debtor") is a chapter 11 debtor and debtor-in-possession in the above-captioned chapter 11 case (this "Case") provides the following disclosure statement (the "Disclosure Statement") pursuant to Sections 105, 1125, and 1129[2] of the Bankruptcy Code. This case was initiated on February 13, 2024 (the "Petition Date"), by the filing of an involuntary petition for relief against Debtor (the "Involuntary Petition") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (this "Court") by Lendlease (US) Construction Inc., Standard Drywall, Inc., Star Hardware, Inc.,

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

---

[2]   References to sections shall refer to Title 11 of the United States Code ("Bankruptcy Code"), unless otherwise referenced.

Woodbridge Glass Inc., and Mitsubishi Electric US, Inc. (collectively, the "Petitioning Creditors"). On March 8, 2024, Debtor filed its *Answer* [ECF No. 27] to the Involuntary Petition and consented to entry of an order for relief. On March 11, 2024 (the "Relief Date"), the clerk of the Court entered the *Order for Relief* [ECF No. 29] (the "Relief Order").

This document is the Disclosure Statement which describes Debtor's Liquidating Plan of Reorganization ("Plan"). October 8, 2024 (the "Voting Deadline"), is the last date by which ballots accepting or rejecting the Plan must be received by counsel for the Debtor. Ballots must be delivered in one of the following manners so that the Ballot is received by Debtor's Solicitation Agent by mail at Oceanwide Plaza LLC Ballot Processing c/o Stretto 410 Exchange, Suite 100, Irvine CA 92602 or electronically under the "File a Ballot" tab at https://cases.stretto.com/OceanwidePlaza/.

Chapter 11 of the Bankruptcy Code allows the debtor, and under some circumstances, creditors, and other parties-in-interest, to propose a plan of reorganization. The Plan is a liquidating plan that contemplates the sale of substantially all of Debtor's assets. After the Plan is fully administered, Debtor will be dissolved. The Plan provides for the closing of the sale of Debtor's Property, as defined below (the "Sale"), on or before the Effective Date, as defined below. The Effective Date of the Plan ("Effective Date") will occur when the following conditions to the effectiveness of the Plan have been satisfied or waived by Debtor: (a) the Plan and all documents, instruments, and agreements to be executed in connection with the Plan shall have been executed and delivered by all parties to such documents, instruments, and agreements; (b) the Plan shall not have been materially altered, amended or modified; (c) there shall be no ruling, judgment, or ordered preventing or prohibiting the consummation of the Sale; and (d) the Sale has been closed and consummated. The sale of the Property will provide the primary means for the implementation of the Plan. All capitalized terms used in this Disclosure Statement are defined in the Plan and shall be deemed to have the same definition as used in the Plan.

This Disclosure Statement contains, among other things, (i) a discussion of some of Debtor's history and business, (ii) a summary of some of the events leading to this Case, (iii) the goal of the Case, (iv) risk factors associated with this Case, (v) a summary and analysis of the Plan,

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION

1  and (vi) certain other related matters. Debtor is the proponent of the Plan within the meaning of

2  Section 1129.

3       Copies of this Disclosure Statement, the Plan, and all other documents related to this Case

4  are available for review without charge through Debtor's Notice and Claims Agent at

5  https://cases.stretto.com/oceanwideplaza/ and with charge at https://www.pacer.gov/.

6       ALL HOLDERS OF CLAIMS AGAINST DEBTOR ARE ENCOURAGED TO READ

7  THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, AND TO CONSULT WITH AN

8  ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, SUBJECT TO

9  CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127,

10  BANKRUPTCY RULE 3019, AND IN THE PLAN, DEBTOR RESERVES THE RIGHT TO

11  ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THE PLAN, OR ANY PART

12  THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION. IF THERE ARE ANY

13  INCONSISTENCIES BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE

14  TERMS OF THE PLAN WILL GOVERN.

15           **II.    BACKGROUND**

16  **A.    Description and History of Debtor's Business and a Summary of the**

17  **Circumstances Which Led to the Filing of this Case.**

18  **Debtor's Business Operations**

19       1.    Debtor, a Los-Angeles based real estate developer, is an American subsidiary of a

20  global Chinese conglomerate. Oceanwide Real Estate Group (USA) Corp. ("OREG"), a Delaware

21  corporation, is Debtor's sole member and its manager. Debtor is part of a corporate family

22  consisting of other senior limited liability companies and is indirectly owned by Oceanwide

23  Holdings Co. Ltd, ("Oceanwide Holdings"), in Beijing, China. Debtor's relevant corporate affiliates

24  are shown on **Exhibit 1.**

25       2.    Debtor was organized in 2013 to purchase a block in downtown Los Angeles across

26  from then Staples Center (now Crypto.com Arena), bounded by Figueroa, Flower, 11th and 12th

27  Streets (generally, the "Real Property"). Debtor purchased the Real Property that year for $174

28

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

million. At the time, the Real Property consisted of an asphalt parking lot and a small two-story building.

3. The Debtor owns Oceanwide Plaza (the "Project"), an approximately 60-percent complete mixed-use development project in downtown Los Angeles. The Project is situated on the Real Property.

4. In connection with the Project, Debtor additionally acquired certain personal property which is both located at the Real Property and in possession of third parties (the "Personal Property", and together with the Real Property, the "Property").

5. The Project is across from Crypto.com Arena and consists of three uncompleted high-rise residential towers: two towers are 42 stories tall, and the other is 55 stories tall which includes a planned 11-story hotel. Each tower is built on a 6-story podium, consisting of parking, retail, dining, and office space, and a planned 2-story-high LED screen wrapped around the podium's Figueroa, 11th, and 12th street facades. The Project's external construction is largely complete, but portions of the Project's internal construction is unfinished.

6. The Project is part of the Los Angeles Sports and Entertainment District, which includes the Convention Center, Crypto.com Arena, LA Live, and the two 30-plus story Circa luxury apartment towers at 12th and Figueroa Streets. It is also part of a broader plan and long-standing goal of the City of Los Angeles ("LA City") to develop this section of downtown Los Angeles into a Times Square-like destination zone with multi-story LED screens, entertainment venues, and night-time dining and clubs.

7. Debtor's pre-petition funding arrangements are set forth in Section B below. For purposes of this Section and context, prior to the Petition Date, Debtor largely self-funded Project construction. However, for short-term needs, L.A. Downtown Investment LP ("LADI") provided Oceanwide with up to $325,000,000 in construction financing (the "Loan"). LADI disbursed $136.5 million to Oceanwide, and Oceanwide re-paid $11 million in principal, reducing the principal owed to $125.5 million.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION

8.      In 2014, Debtor hired RTKL Associates, Inc., now known as CallisonRTKL Inc., as its architect, and Lendlease (US) Construction, Inc. ("Lendlease") as construction manager, to begin work on the Project and entered into separate contracts with them.

9.      In 2015, the existing structure and parking lot were demolished, and excavation began. Debtor hired Swinerton Management Consulting ("Swinerton") to manage the construction phase and supervise a general contractor.

10.     In 2016, after a bidding process, Debtor hired Lendlease as its general contractor to construct the Project and Lendlease then hired over forty subcontractors.

11.     In March 2018, the Project "topped-out": the high-rise towers were finished to their top floors. Shortly thereafter, Debtor began loan negotiations with JPMorgan Chase Bank, N.A. for a $1.1 billion loan facility. These negotiations continued into 2019 but were ultimately not successful.

**Debtor's Liquidity Struggles and Pre-Petition Efforts to Reorganize**

12.     In November 2018, Debtor began to have difficulty obtaining additional capital transfers from its affiliates in China. Debtor believes that these funding difficulties arose for several reasons, including regulatory restrictions by the Chinese government on current transfers and other macro-economic conditions.

13.     Debtor understands that as a result of its capital challenges, Lendlease demobilized most of its subcontractors by mid- January 2019, but continued to perform a small amount of work.

14.     Without access to capital, Debtor then pursued three alternative plans beginning in later January 2019: 1) find alternative construction financing to complete the Project, 2) enter into a joint venture agreement to complete the Project, or 3) sell the Project.

15.     Debtor attempted to obtain alternative construction financing from January 2019 to September of 2020, but was unable to close on such financing. Debtor believes that its efforts to obtain alternative financing were negatively impacted by the COVID-19 pandemic and related economic slowdown, which impacted both national and global lending markets.

16.     Debtor then shifted to primarily focus on selling the Project in May 2021. Prior to the Petition Date, Debtor was in serious negotiations with two potential purchasers who were in the

Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

process of conducting due diligence; one who signed a Letter of Intent ("LOI") in August 2023 and the other who signed a LOI in September 2023.

**The Webcor Litigation**

17.    Because Debtor failed to pay contractors, they recorded mechanic's liens on the Real Property. On January 31, 2019, a Lendlease subcontractor, Webcor Construction, LP, ("Webcor") sued to foreclose on its mechanic lien in Los Angeles Superior Court case number 19STCV03357 (the "State Court Action")[3], the first of 44 foreclosure cases filed against Oceanwide or Lendlease, including Lendlease suing Oceanwide. Lendlease and 27 contractors also sued LADI for a judgment holding their liens were superior to LADI's deed of trust; and Lendlease and 7 contractors also named LADI's title insurance company, Chicago Title Insurance Company ("CTIC"). Webcor also sued for declaratory relief that LADI's deed of trust is invalid and unenforceable. LADI and CTIC cross-sued Lendlease. All of these cases were consolidated into the State Court Action.

18.    On March 22, 2023, the Superior Court resolved a threshold issue on cross-motions, holding LADI's Deed of Trust was senior to the contractors' mechanic's liens. The Superior Court then trifurcated the State Court Action into three trials, which are known as Phase One, Phase Two, and Phase Three. Phase Two was later continued to after Phase Three.  A final judgment will be entered incorporating each phase's rulings after the last trial.

19.    In the Phase One trial, the Superior Court ruled Debtor owes Lendlease: (1) $465,494.23 under Lendlease's 2014 contract with Debtor; (2) $2,512,743 for interest due through October 2, 2019 under its 2016 contract with Debtor; (3) prompt payment penalties of $121,866,906 as of on or about March 14, 2024 under California Civil Code section 8800; and (4) $118,482,627, an aggregate amount stipulated by Debtor and Lendlease as owed by Debtor for the reasonable value of work performed by Lendlease and subcontractors except Webcor.

20.    In the Phase Three trial, the Superior Court ruled Debtor owes Lendlease $51 million for the reasonable value of work performed by Webcor.

---

[3]    The description of the State Court Action provided in this Disclosure Statement is intended as a summary only and not intended to be a complete description of all matters asserted and addressed in the State Court Action.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

21. The Phase Two trial involves Lendlease's and other subcontractors' challenges to the validity of LADI's Deed of Trust, LADI's and CTIC's cross-claims against Lendlease, and LADI's attempt to reduce Lendlease's lien. More specifically, Lendlease and certain subcontractors assert LADI's underlying loan is invalid because LADI and Debtor are one entity and raise certain other fraud-based claims against LADI. LADI, in turn, asserts Lendlease and its subcontractors subordinated their lien rights to LADI's deed of trust. Trial was set for June 2024, but was stayed (and vacated) when the Involuntary Petition was filed. This Court lifted the stay, effective June 13, 2024, to allow the State Court Action to continue through final judgment and appeals, and the Phase Two trial is set to start on October 28, 2024.

**Debtor Is Working With LA City As A Result of International Attention Causing Security Issues**

22. Oceanwide originally garnered international attention for its scale and ambition, its expected substantial economic impact on downtown Los Angeles, creating jobs and boosting the local economy. It later drew a different kind of focus.

23. Despite Debtor's lack of funds pre-petition, its security service agreed to provide two guards on a 24/7 full time basis. There were recent notable incidents, however, in the first quarter of 2024 involving graffiti and base jumping, including a group of graffiti artists and base jumpers that illegally accessed the unfinished skyscraper. These incidents were widely covered in the media and heighted the need for immediate security measures.

24. On February 9, 2024, the Los Angeles City Council unanimously adopted a resolution stating the Project "has been a blight on Downtown Los Angeles' South Park neighborhood," noting criminal activity had "increased exponentially" in early 2024, including trucks ramming into the Project's gates and driving into the building to facilitate copper wire theft, trespassers climbing hundreds of feet to tag windows with graffiti, and individuals base jumping from the top floor of the Project. LA City also issued an abatement notice ordering Debtor to remove the graffiti and secure the property. Debtor was unable to comply with the abatement orders due to its lack of funds and the City Council voted to allot nearly $4 million to remove graffiti and secure the Property.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

8

25.    Since February 1, 2024, the Los Angeles Police Department has had a constant presence at the site. It had allocated significant manpower to this effort to hold the perimeter of the property.  It began installing a 14-foot high, stagger-perforated steel-sheet fence (i.e., anti-climb fencing) around the Project on February 23, 2024, and started to installed razor wire in an area deemed particularly prone to breach.

26.    Debtor took over these security efforts once it secured DIP Financing.

27.    As noted above, Lendlease and four other creditors filed an involuntary bankruptcy petition against Debtor on the Petition Date.

28.    Through the DIP Financing, described below, Debtor is working with LA City to safeguard the Property, pay the cost of security, increased to six 24/7 private security guards, and implement other security measures to prevent trespassing such as the installation of razor wire and blocking off entrances to protect the Property and reduce access for potential trespassers.

**B.    Pre-Petition Financing Arrangements**

31.    Debtor has self-funded construction of the Project with approximately $956.6 million in capital transfers and received approximately $118.4 million in inter-company loans (summarized below).  The capital transfers made up about 80% of the funding.

32.    For short-term needs, and as noted above, Debtor obtained a credit line with a $325 million limit from LADI. Debtor understands that LADI is an investment vehicle deployed under the federal government's EB-5 Immigrant Investor visa program. The credit line extended by LADI (generally, the "EB-5 Loan") is evidenced by a $325 million *Promissory Note* which is secured by a *Deed of Trust* in favor of LADI (the "EB-5 Deed of Trust"). Debtor understands that LADI recorded the EB-5 Deed of Trust against the Property in 2015 to secure repayment of any disbursements under the EB-5 Loan.

33.    LADI has disbursed approximately $136.5 million to Oceanwide. Oceanwide re-paid $11 million of the principal, reducing the principal amount of the debt to $125.5 million, which together with interest, late fees, etc., remains outstanding.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

34.     In sum, between the self-funded capital transfers and intercompany loans, and the EB-5 Loan disbursements made by LADI, Debtor has invested approximately $1.20 billion in the Project's construction:

| Capital and Debt | Amount |
| --- | --- |
| *Capital Transfer* | |
| China Oceanwide Holdings Limited | $956,527,033.22 |
| **Subtotal** | **$956,527,033.22** |
| *Debt* | |
| L.A. Downtown Investment LP | $136,500,000.00 |
| Oceanwide Real Estate Group (USA) Corp. | $95,000,000.00 |
| Oceanwide Investment Three (Hungry) Limited Liability Company | $23,400,000.00 |
| **Subtotal** | **$254,900,000.00** |
| **TOTAL** | **$1,211,427,033.22** |

**C.     Events During Debtor's Chapter 11 Case.**

*a.     Employment of Professionals and Consultants*

Debtor has employed, and the Court has authorized the employment of, the following professionals: Bryan Cave Leighton Paisner, LLP ("BCLP") as chapter 11 bankruptcy counsel [ECF No. 298]; Stretto, Inc. ("Stretto") as claims, noticing and solicitation agent ("Claims and Noticing Agent") [ECF No. 315]; Bradley Sharp and Development Specialists, Inc. ("DSI") as Debtor's Chief Restructuring Officer ("CRO") [ECF  No. 306]; B. Riley Advisory Services ("B. Riley") as Financial Advisor [ECF No. 311]; and Colliers International greater Los Angeles, Inc. ("Colliers") and Hilco Real Estate, LLC ("Hilco," and collectively with Colliers, the "Brokers") as real estate brokers [ECF No. 268].

*b.     Claims Bar Date*

At a hearing dated March 29, 2024, and by order of the Court, the Court established a deadline for creditors to file proofs of claim against Debtor. [ECF No. 89]. On April 18, 2024, Debtor submitted its Notice of Bar Date for Filing Proofs of Claim in a Chapter 11 Case [ECF No. 159] which provided for a general bar date for creditors of June 26, 2024, and a governmental claim bar date of September 7, 2024.

Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

c.    *Summary of Scheduled and Filed Claims*

Attached as **Exhibit 2** is a chart for each of the claims that Debtor identified in its schedules and each proof of claim with the asserted amount of that claim that has been filed against Debtor along with the amounts and status of each such claim.

Below is a summary of the total scheduled claims by Debtor and the total filed claims by creditors:

i.    Secured Claims

Debtor scheduled a total of approximately $370,730,000 in secured claims, plus super-priority liens granted to DIP Lender in the original principal amount of $9,186,943, plus DIP Lender's reasonable counsel fees and other expenses, and interest. Approximately $372,000,000 in secured claims have been asserted against Debtor in timely filed proofs of claim.

ii.    Priority Tax Claims

Debtor scheduled a total of approximately $145,000 in priority tax claims. Approximately $319,000 in tax priority claims have been asserted against Debtor in timely filed proofs of claim.

iii.    Non-Tax Priority Claims

Debtor has scheduled a total of approximately $60,600 of non-tax priority claims, representing wage claims owed to Debtor's employees. Approximately $79,600 in non-tax priority claims have been asserted against Debtor in timely filed proofs of claim.

iv.    General Unsecured Claims

Debtor scheduled a total of approximately $176,700,000 in non-priority general unsecured claims. Approximately $345,176,000 in non-priority general unsecured claims have been asserted against Debtor in timely filed proofs of claim.  This amount does not include unsecured intercompany loans, which are more fully set out below.

v.    Intercompany Loans

Debtor owes a total of approximately $219,300,000 in intercompany loans, inclusive of interest, which accrued prior to the Petition Date (the "Intercompany Loan Claims"). The intercompany loan claims stem from two loans made to Debtor. First, is a loan which was disbursed in multiple installments from October of 2014 to September of 2015 in the total original principal

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

amount of $23.4 million, with annual interest accruing at 11.5%, which is currently held by Oceanwide Investment Three (Hungary) Limited Liability Company. Second is a loan disbursed in December 2013 in the original principal amount of $95 million, with annual interest accruing at 6.5%, which is currently held by Oceanwide Real Estate Group (USA) Corp.

Debtor's investigation of the Intercompany Loan Claims remains ongoing. To the extent that the allowance of the Intercompany Loan Claims is not resolved on or prior to the Effective Date, the Liquidating Trust will continue any such investigation, and if warranted, prosecute objections to remaining claims. Debtor intends to pay the Allowed Intercompany Loans *in pari passu* with the holders of General Unsecured Claims.

d.    *DIP Financing*

The ability of Debtor to continue to protect and maintain the Property during the pendency of this Case was dependent on Debtor acquiring post-petition financing. Debtor filed a *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing* [ECF No. 40] (the "DIP Financing Motion") on March 12, 2024. Debtor initially sought a $10 million dollar secured credit facility ("DIP Financing") from B.H. Capital Ventures, LLC (the "Original DIP Lender"), priming prepetition secured creditors, including, among others, LADI, Lendlease and the County of Los Angeles. Debtor set the DIP Financing Motion for an emergency hearing for March 14, 2024 (the "Initial DIP Hearing").

Prior to the Initial DIP Hearing, Debtor received (i) three objections to the DIP Financing Motion filed by the County of Los Angeles ("LA County") [ECF No. 59] Lendlease [ECF No. 50], and LADI [ECF No. 54], (ii) one joinder filed by petitioning creditor Woodbridge Glass Inc. [ECF No. 51], and (iii) informal comments from the Office of the United States Trustee (the "US Trustee"). Debtor eventually selected DTLA Lending LLC as the lender for the DIP Financing (the "DIP Lender") and the Court eventually authorized Debtor to borrow on an interim basis, an amount up to $1,449,222 and entered its *Interim Order (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing* [ECF No. 176] (the "Interim DIP Order")

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

12

1    on April 26, 2024. Debtor then requested authorization to borrower the remainder of the DIP

2    Financing at the final hearing on the DIP Financing Motion scheduled for May 9, 2024 (the "Final

3    DIP Hearing").

4        Debtor successfully negotiated a resolution to the DIP Financing and the remaining

5    objection was withdrawn. The Court entered its *Final Order (I) Authorizing the Debtor to Obtain*

6    *Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, and*

7    *(III) Modifying the Automatic Stay* [ECF No. 229] (the "Final DIP Order") on May 16, 2024. Per

8    the terms of the Final Order, and Debtor's resolution of the remaining objection, the Court

9    authorized Debtor to borrow up to $9,186,943 (inclusive of approved interim financing), pursuant

10    to a specific budget, with Debtor obligated to repay the principal amount borrowed, plus DIP

11    Lender's reasonable counsel fees and other expenses, and interest which accrues at the annual rate

12    of 4.5%, all as set forth in the Final DIP Order, DIP Credit Agreement and related documents.

13        *e.    Limited Relief from Stay Regarding the State Court Action*

14        On March 28, 2024, LADI submitted its *Motion for Relief from the Automatic Stay as to*

15    *Nonbankruptcy Action* [ECF No. 80] (the "Relief from Stay Motion") alleging, among other things,

16    that LADI's dispute with Lendlease concerning the priority of their respective liens should be

17    resolved in the State Court Action. On April 11, 2024, Debtor submitted its Objection to LADI's

18    Motion for Relief From Stay [ECF No. 141] (the "Debtor Stay Relief Objection"). Lendlease filed

19    a joinder and supporting evidence to the Debtor Stay Relief Objection [ECF No. 143]. The Court

20    held a hearing on the Relief from Stay Motion on May 15, 2024, and, on May 29, 2024, the Court

21    entered its *Order Granting Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362* [ECF

22    No. 241] (the "Stay Relief Order") which, among other things, terminated the automatic stay as to

23    Debtor and Debtor's estate for all parties and stated that such parties could proceed to a final

24    judgment, including appeals, in accordance with non-bankruptcy law. The automatic stay was not

25    terminated with respect to any effort to enforce any judgment rendered in the State Court Action or

26    to collect any claim against Debtor. As of the date of this Disclosure Statement, the State Court

27    Action remains pending.

28

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

*f.    U.S. Trustee's Motion to Dismiss Denied*

On June 6, 2024, the United States Trustee filed its *Notice of Motion And Motion Under 11 U.S.C. § 1112(B) To Dismiss, Convert, Or Direct The Appointment Of A Chapter 11 Trustee, Or For A Deadline To Obtain Insurance* [ECF No. 294] (the "UST Motion to Dismiss"). Oppositions to the Motion to Dismiss were filed by Debtor, LA City, and Lendlease [ECF Nos. 333, 334 and 342] and joinders to the oppositions were filed by Secured Creditor and Mechanic's Lien Creditor Bragg Investment Co., Inc. [ECF No. 348], ACCO Engineered Systems, Inc., Bapko Metal, Inc., and Marin Bros / Marcowall, Inc. [ECF No. 349]. The UST filed its Omnibus Reply on July 18, 2024 [ECF No. 350]. At the hearing held on July 25, 2024, the Court denied the UST Motion to Dismiss, and entered its order to that effect on July 26, 2024. [ECF No. 371].

*g.    Settlement-Efforts / Mediation With Consulting Parties*

In late April 2024 / early May 2024, Debtor, LADI, Lendlease, CTIC and LA City started to engage in serious negotiations to resolve objections to DIP Financing and to work on a path to consensually move the chapter 11 case forward. The informal settlement-efforts resulted in a consensual resolution of the Final DIP Order that included an agreement to convene confidential regular meetings with these parties (now known as the "Consultation Parties") and an agreement to mediate with the Honorable Randall Newsome (Ret.). An *Order Approving Stipulation To Approve Confidentiality And Nondisclosure Agreement* was entered on June 25, 2024. [ECF No. 292].

During the mediation, Debtor and the Consulting Parties agreed on the sale process and deadlines regarding the sale and the disclosure statement and plan of reorganization. Judge Newsome has agreed to remain "on call" to assist the parties with disputes, if any, as they arise, to try to avoid formal litigation that will delay the sale process and in return, delay or put into jeopardy a return to creditors.

*h.    Bidding Procedures / Sale of Property*

The sale of the Property is crucial to the consummation of the plan. On June 12, 2024, the Court entered an *Order Granting Debtor's Motion to (I) Approve Auction and Bid Procedures for the Sale of Property; (II) Scheduling an Auction and Approving the Form and Manner of Notice Thereof; and (III) Granting Related Relief* [ECF No. 276] (the "Bid Procedures Order"). Pursuant

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION

to the terms of the Bid Procedures Order, (a) bid procedures are approved ("Bidding Procedures") regarding the sale and auction of Debtor's Property; (b) Debtor is authorized, in consultation with the Consultation Parties, upon notice and a hearing, to designate a stalking horse ("Stalking Horse Bidder") and to provide any such Stalking Horse Bidder with certain bid protections ("Bid Protections") in the form of expense reimbursements and/or a breakup fee; and (c) in the event an auction is held to sell Debtor's Property ("Auction").   On July 9, 2024, the Court entered an *Order Approving Stipulation To Modify Certain Sale Schedule Dates* [ECF No. 319] (the "First Modified Bid Procedures Order"). The First Modified Bid Procedures Order 1) extended the deadline to select a Stalking Horse Bidder from July 1, 2024, to July 3, 2024; 2) extended the deadline for the Debtor to file a notice of selection of Stalking Horse Bidder to July 16, 2024; and 3) continued a hearing on a proposed Stalking Horse Bidder and Bid Protections from July 10, 2024 at 1:00 p.m. to July 23, 2024 at 3:00 p.m.  On July 3, 2024, the Debtor selected a proposed stalking horse bidder subject to the Debtor's continued due diligence. However, Debtor was not satisfied with the results of this due diligence and did not proceed with that party as the stalking horse bidder at that time.

Debtor requested that the Court extend the time for Debtor to select a stalking horse bidder and approve a 2.5 % breakup fee that Debtor may offer to a potential Stalking Horse Bidder without further order of the Court (the "Break-Up Fee").  After additional briefing and evidence, the Court entered its *Modified Order Granting Debtor's Motion To (I) Approve Auction And Bid Procedures For The Sale Of Property; (II) Scheduling An Auction And Approving The Form And Manner Of Notice Thereof; And (III) Granting Related Relief.*  [ECF No. 374] (the "Second Modified Bid Procedures Order").  The Second Modified Bid Procedures Order further modified certain sale and plan and disclosure statement dates.  Debtor is keeping the Consultation Parties apprised of its discussions with potential stalking horse bidders, subject to a confidentiality agreement executed by Debtor and each of the Consultation Parties.

The deadline for interested parties to submit bids is August 15, 2024 (the "Bid Deadline") and an auction is scheduled for September 19, 2024.  After the bidder with the highest and best bid, or the second highest and best bid as applicable (the "Winning Bidder") is identified, through the auction or otherwise, Debtor will then seek approval of the sale through the process set forth in it's

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

15

liquidating Chapter 11 Plan, pursuant to the Court's Order confirming that plan. The closing of the sale of the Property will occur on or before the Effective Date. Debtor anticipates using the amount received from the Winning Bidder, or the Back-Up Bidder, as the case may be, after all costs and expenses are deducted from the gross proceeds arising from the sale of an asset, or a deduction of $200,000 (the "Post-Confirmation Reserve"), (the "Sale Proceeds") to fund the administrative expenses for the Liquidating Trust which will administer this Plan following the Effective Date (the "Liquidating Trust"), to satisfy creditors as set forth in Section III, below.

### III.    PLAN SUMMARY

A summary of the composition of each of the classes under the Plan and the treatment of the members of each class is below.[4] In accordance with Section 1123(a)(1), Debtor has not classified administrative claims, priority tax claims, and professional fee claims. Debtor anticipates receiving bids by the Bid Deadline which will provide for a purchase price sufficient to pay Classes 1 through 5 below in full. There is also a possibility that competitive bidding will result in a greater return and that additional classes will be paid in full. It is possible that Debtor will be unable to come to an agreement with a bidder, or that any bid may not be consummated, and the final sale price may be lower. Additionally, to the extent there are any disputes as to the amount or priority of payments to each of the classes set forth below, the amount of the Sale Proceeds subject to such dispute will be placed in an interest-bearing escrow account pending a final order of the Court with respect to such dispute.

Parties should refer to the Plan for a more complete description of the treatment of Claims.

*Class 1 – Secured Tax Claims.*  Debtor scheduled $18,463,711.62 in tax claims which are secured by tax liens on the Property, which have priority over all other secured claims on the Property including the DIP Facility Claims, described below.  Debtor intends to pay all Secured Tax Claims in full from the Sale Proceeds.

*Class 2 – LADI Secured Claim.* Debtor believes that the LADI Secured Claim is approximately $125,000,000, plus interest, fees, expenses and any other amounts allowed under

---

[4]    Please see Exhibit 2 for a schedule for a list of scheduled claims and filed proofs of claim with the asserted amount for each claim.

Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

the applicable loan documents. Debtor anticipates paying the LADI Secured Claim in full from the Sale Proceeds. To the extent that the Sale Proceeds are insufficient to pay the LADI Secured Claim, Lendlease Secured Claims and Other Secured Claims in full, or if the LADI Secured Claim is otherwise disputed in whole or in part, then the LADI Secured Claim will be subject to the Disputed Creditor Reserve Treatment, as defined in Section IV(C)(9) below and will only be paid as provided for in that Section, or in accordance with the terms of the Liquidating Trust Agreement or as otherwise ordered by the Court.

*Class 3 – Lendlease Secured Claims*. Debtor believes that the Lendlease Secured Claims total approximately $170,730,330. The amount set forth in the Lendlease Secured Claims includes direct claims held by Lendlease against Debtor and secured claims held by subcontractors that Debtor and Lendlease are jointly liable.

Debtor has divided Class 3 into two subclasses. Class 3(a) includes the secured claims held directly by Lendlease. Class 3(b) includes the Secured Claims held by subcontractors of Lendlease for which Debtor and Lendlease are both liable, including Claims of subcontractors to Lendlease which have been or may be assigned to Lendlease or any of its affiliates.

Following the Effective Date, the Liquidating Trustee shall identify which claims have been paid by Lendlease and which remain unpaid pursuant to the terms of the Liquidating Trust Agreement. The Liquidating Trust will make a distribution of an allowed Class 3(b) claim directly to the subcontractor, unless it is determined that the Holder of the Class 3(b) claim was paid by Lendlease.  In that case, the distribution shall be paid to Lendlease.

Debtor anticipates paying the Lendlease Secured Claims in full from the Sale Proceeds. To the extent that the Sale Proceeds are insufficient to pay the LADI Secured Claim, Lendlease Secured Claims and Other Secured Claims in full, or if the Lendlease Secured Claim is otherwise disputed in whole or in part, then the Lendlease Secured Claim will be subject to the Disputed Creditor Reserve Treatment, and will only be paid as provided for in that Section, or in accordance with the terms of the Liquidating Trust Agreement or as otherwise ordered by the Court.

*Class 4 – Other Secured Claims*. Debtor believes that there are approximately $15,000,000 in other secured claims asserted against the Property, largely representing mechanics lien claimants.

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

Some creditors in Class 4 may have a senior priority lien to Class 3 or Class 4 creditors. Debtor anticipates paying the Other Secured Claims in full from the Sale Proceeds. To the extent that the Sale Proceeds are insufficient to pay the LADI Secured Claim, Lendlease Secured Claims and Other Secured Claims in full, or if an Other Secured Claim is otherwise disputed in whole or in part, then the Other Secured Claim will be subject to the Disputed Creditor Reserve Treatment, and will only be paid as provided for in that Section, or in accordance with the terms of the Liquidating Trust Agreement or as otherwise ordered by the Court.

Class 5 – *Reserved*.

*Class 6 – Other Priority Claims*. Debtor believes that certain of its employees hold Other Priority Claims that are entitled to priority under the Bankruptcy Code in the approximate amount of $205,500. Debtor anticipates paying the Holders of Other Priority Claims in full from the Sale Proceeds. However, in the event that the remaining Sale Proceeds are insufficient to pay the Other Priority Claims in full, then the Holder of each such Other Priority Claim shall be paid *pro rata* from the remaining Sale Proceeds based on the size of each Holder's Other Priority Claim. If any Other Priority Claim is disputed, in whole or in part, then such Other Priority Claim will be subject to the Disputed Creditor Reserve Treatment, and will only be paid as provided for in that Section, or in accordance with the terms of the Liquidating Trust Agreement or as otherwise ordered by the Court.

*Class 7 – General Unsecured Claims*. Debtor believes that there are approximately $176,700,000 in unsecured claims, excluding intercompany loans, in this estate.[5] Debtor anticipates making a distribution to unsecured creditors. The ultimate recovery of Holders of General Unsecured Claims will depend on the Sale Proceeds generated by the Sale. Debtor believes that such recovery could be high as 100% of the amount of General Unsecured Claims asserted. However, the Holders of General Unsecured Claims could receive no distribution, depending on the final amount of the Sale Proceeds. If any General Unsecured Claim is disputed, in whole or in part, then such General Unsecured Claim will be subject to the Disputed Creditor Reserve Treatment, and will only be paid as provided for in that Section, or in accordance with the terms of

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

---

[5]  A breakdown of each of the unsecured claims is set forth in Schedule 1 to this Disclosure Statement.

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

the Liquidating Trust Agreement or as otherwise ordered by the Court. To the extent that any claims initially included in Class 7 are re-characterized and Allowed as equity interests, they will be instead by included in Class 10 below.

*Class 8 – Intercompany Claims*. Debtor owes a total of approximately $219,300,000 in Intercompany Loan Claims. Debtor intends to pay Allowed Intercompany Loan Claims *in pari passu* with the General Unsecured Claims outlined in Class 7 above. If any Intercompany Claim is disputed, in whole or in part, then such Intercompany Claim will be subject to the Disputed Creditor Reserve Treatment, and will only be paid as provided for in that Section, or in accordance with the terms of the Liquidating Trust Agreement or as otherwise ordered by the Court. To the extent that any claims initially included in Class 8 are re-characterized and Allowed as equity interests, they will be instead by included in Class 10 below.

*Class 9 – Subordinated Claims.* Class 9 shall consist of all Claims that is subject to (a) subordination under Section 510(b), or (b) equitable subordination, as the Bankruptcy Court determines in a Final Order ("Subordinated Claims"). To date, no Claims scheduled or filed in this matter are Subordinated Claims under this Class 9. If any Subordinated Claim is disputed, in whole or in part, then such Subordinated Claim will be subject to the Disputed Creditor Reserve Treatment, and will only be paid as provided for in that Section, or in accordance with the terms of the Liquidating Trust Agreement or as otherwise ordered by the Court.

*Class 10 – Equity Holders*. The equity structure of Debtor will remain unchanged as a result of the Plan and the Confirmation Order. In the event that the Sale Proceeds are sufficient to pay the claims of Classes 1-9 above, any such remaining Sale Proceeds shall be distributed to Equity Holders, in accordance with their interest in Debtor. Class 10 will be entitled to vote on the Liquidating Chapter 11 Plan.

## IV.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.

### A.    What Creditors and Interest Holders Will Receive Under the Plan.

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

is impaired or unimpaired. The Plan provides the treatment each class will receive, as described in Section III above.

**B.    Unclassified Claims.**

Certain types of claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided for in the Bankruptcy Code. As such, Debtor has not placed the following claims in any class:

**1.    DIP Facility Claims.**

The DIP Facility is for the original principal amount of $9,186,943. Debtor anticipates seeking authority to borrow an additional $3 million dollars under the DIP Facility. Therefore, Debtor anticipates that advances under the DIP Facility will amount to no more than $14 million, inclusive of interest, fees, costs, and other expenses. Debtor is liable to DIP Lender for all amounts borrowed, plus interest, fees, expenses and any other amounts allowed under the Final DIP Order. The DIP Facility Claim is secured by, among other things, a priming lien on the Property with priority above all other interests, except the Secured Tax Claims. Debtor anticipates paying the DIP Facility Claims in full from the Sale Proceeds upon the closing of the Sale.

**2.    Administrative Claims.**

Administrative claims are claims for costs or expenses of administering Debtor's chapter 11 case which are allowed under Bankruptcy Code Section 507(a)(2) ("Administrative Claims"). The Bankruptcy Code requires that all allowed administrative expense claims be paid in full on the Effective Date unless a particular claimant agrees to a different treatment. The Liquidating Trustee will pay all allowed § 507(a)(2) Administrative Claims, that are not otherwise paid with the DIP Financing, either (i) on or prior to the Effective Date, or (ii) at the time such Administrative Claims are allowed by the Court or as soon thereafter as is practicable. The Liquidating Trustee will pay all such allowed Administrative Claims out of the Sale Proceeds. The Debtor anticipates that all administrative claims will be paid as of the Effective Date of the Plan and that the only claims that will accrue are those set forth in the Final DIP Order, as amended.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

3.    **Professional Fee Claims.**

Professional Fee Claims are Administrative Claims that are also Unclassified. The Court must approve all professional fees and expenses before they may be paid. For all professional fees and expenses, except fees owing to the Clerk of the Bankruptcy Court and fees owing to the U.S. Trustee, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees and expenses allowed by the Court will be required to be paid under the Plan. Much of the professional fees and expenses that will be owed as Administrative Claims following Plan Confirmation will be dependent upon whether Debtor is required to engage in any substantial litigation regarding Plan Confirmation, objecting to any Disputed Claims, or estimating any contingent or unliquidated Claims. By voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any Administrative Claims, and creditors are not waiving any of their rights to object to the allowance of any administrative expense claims. Similarly, Professionals who have been employed in these cases are not being deemed to have agreed to any cap on the amount of fees and expenses that they have incurred or are entitled to seek to be paid pursuant to Court order. Debtor also reserves all rights to file objections to any such asserted Administrative Claims.

4.    **Priority Tax Claims**.

Priority tax claims include certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code. Section 1129(a)(9)(C) of the Bankruptcy Code requires that each holder of a Section 507(a)(8) priority tax claim receive regular installment payments of a total value, as of the Effective Date, equal to the allowed amount of such allowed tax claims, over a period ending not later than five years after the Petition Date. Pursuant to the terms of the Plan, Debtor intends to pay Allowed Priority Tax Claims in accordance with the terms set forth in Section 1129(a)(9)(C). To the extent any allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid as may be due in payable under applicable non-bankruptcy law. Debtor is in the process of reviewing all filed priority tax claims and will file objections to any of them which Debtor disputes.

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

5.　　**Statutory Fees.**

Debtor shall pay all fees due and owing to the U.S. Trustee, including quarterly fees under 28 U.S.C. § 1930(a), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of Debtor's business at the time of Confirmation, pursuant to the applicable statutory payment schedule.

C.　　**Means of Effectuating and Implementing the Plan.**

1.　　**Funding for the Plan**.  The sources of the payments to be made by the Liquidating Trustee under the Plan will be from (i) the Sale Proceeds; (ii) the liquidation of all of Debtor's assets not sold to the Winning Bidder, except for Sale Proceeds; (iii) Cash on hand; and (iv) any Causes of Action, less any amounts required to be remitted to the Liquidating Trustee to wind up the estate ("Plan Administration Assets").  Debtor asserts that it will be able to pay its Unclassified Claims, and Classes 1 through 6 if proceeds of the sale of the Property exceeds $430 million.  A chart setting forth those assumptions is attached as **Exhibit 3** (the "Break-Even Analysis").  The waterfall distribution to each class of creditors will change depending on the final amount of proceeds realized from the Property.

2.　　**Sale of the Property.**  The sale of the Property is crucial to the consummation of the Plan. On or before the Effective Date, Debtor shall consummate the Sale, and any other transactions contemplated by the Purchase and Sale Contract. Upon consummation of the Sale, the Property shall be transferred and vest in the Winning Bidder (or Backup Bidder). Upon entry of the Confirmation Order by the Bankruptcy Court, the Sale and Purchase and Sale Contract will be deemed approved. The Sale Proceeds generated by the Sale of the Property will be used to pay allowed claimholders, in the priority outlined in Section II above.

3.　　**Liquidation of Plan Administration Assets**[6].  On the Effective Date, the trustee of the Liquidating Trust (the "Liquidating Trustee"), who Debtor anticipates will be Bradley Sharp with Development Specialists, Inc., shall accept authority over the Plan Administration Assets, which will include any Personal Property not sold to the Winning Bidder and the Post-Confirmation Reserve, as Liquidating Trustee. The Liquidating Trustee may abandon or otherwise

Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386

---

[6]　 A copy of the proposed Liquidating Trust will be provided with the Plan Supplement.

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

not accept any assets that Liquidating Trustee believes, in good faith, have no value to the administration of the Plan or the Wind Down. As of the Effective Date, all unencumbered assets vested as Plan Administration Assets and all unencumbered assets dealt with in the Plan shall be free and clear of all liens, claims, and equity interests except as otherwise specifically provided in the Plan or in the Confirmation Order. Among other powers, the Liquidating Trustee shall have the power to liquidate the Plan Administration Assets and use such funds to pay the holders of allowed claims in the priority outlined above. The Liquidating Trust will remain in place to, among other things, allow for the resolution of any priority disputes between secured creditors and to pay the Priority Tax Claims over time pursuant to 11 U.S.C. § 1129(a)(9)(C)(ii).

4.      **Transfer to the Liquidating Trust.** As of the Effective Date, all remaining assets and property of Debtor will be transferred to the Liquidating Trust. For the avoidance of doubt, Debtor's books and records will be included in any such transfer. The Liquidating Trust will be Debtor's successor to all rights and privileges, including attorney client privilege.  The Liquidating Trust will be funded through either: (a) Sale Proceeds, to the extent that they are enough to pay all secured Claims in full or; (b) a carve out from the holders of Secured Claims for the Post-Confirmation Reserve, subject to the agreement of such secured creditors.

5.      **Causes of Action.**  Any causes of action held by the estate, if any, shall be transferred to the Liquidating Trustee as of the Effective Date. The Liquidating Trustee shall have the authority to assert, settle or abandon any causes of action transferred to it. In the event there is any recovery on any causes of action, such amounts will be used to pay the holders of allowed claims in the priority outlined in Section II above. All causes of action between the Debtor and any other party pending prior to the Effective Date will be transferred to the Liquidating Trust as of the Effective Date. At such time, the Liquidating Trust will be entitled to all claims, defenses, and other rights and privileges accorded to the Debtor in such proceedings following their transfer. All adversary proceedings and contested matters pending as of the Effective Date will continue without change to their status or parties, except that to the extent the Debtor is a party thereto, the Liquidating Trustee will be substituted for the Debtor, without the need for any further order or action by the Debtor or the Liquidating Trustee.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

6.    **Composition of Debtor Post-Confirmation.** Following the Effective Date of the Plan, Debtor will dissolve.

7.    **Distribution Agent.**    The Liquidating Trustee shall serve as the disbursement agent for purposes of timely making all disbursements to be made under the Plan.

8.    **Employment of Professionals by the Liquidating Trustee.** The Liquidating Trustee may retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution, and distribution of Plan Administration Assets.

9.    **Protocol for the Liquidation of Disputed Claims.**

a.    *Transfer of Sale Proceeds to Liquidating Trust.* If the Sale Proceeds are insufficient to pay Holders of Secured Claims in full, and/or if a Claim is Disputed, then the portion of the Sale Proceeds that would be used to pay such Claims, including any postpetition interest allowable pursuant to Section 506(b) of the Bankruptcy Code as of the sale date along with a reserve sufficient to cover interest estimated to accrue on the claim through and including the time a Final Order is entered, will be deposited into a blocked segregated account to be maintained by the Liquidating Trust for the benefit of the Holders of such Claims (the "Disputed Creditor Reserve"), with all such liens, claims, encumbrances, and/or interests of the Holder of such Claims to the Property attaching to the Sale Proceeds in the same order and priority as they previously attached to the pertinent sold Property.

b.    *Payments and Distributions on Disputed Claims.* Except as otherwise provided in the Plan, a Final Order, or as agreed to by the Liquidating Trustee and the Holder of a Disputed Claim, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made by the Liquidating Trustee on such Allowed Claim on the later of (i) the first day that is five (5) Business Days after such Disputed Claim becomes Allowed, in whole or in part; (ii) the day that distributions become

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1   available to members of that Class, with all appropriate reserves for

2   remaining Disputed Claims being in place; (the "Disputed Creditor Reserve

3   Treatment") *provided, however*, that: (I) Disputed Administrative Claims

4   with respect to liabilities incurred by Debtor in the ordinary course of

5   business during the Chapter 11 Case or assumed by Debtor on or before the

6   Effective Date that become Allowed after the Effective Date shall be paid or

7   performed in the ordinary course of business in accordance with the terms

8   and conditions of any controlling agreements, course of dealing, course of

9   business, or industry practice; and (II) Disputed Priority Tax Claims that

10   become Allowed Priority Tax Claims after the Effective Date shall be treated

11   as Allowed Priority Tax Claims in accordance with Article II of the Plan.

12   *c.*   The Bankruptcy Court shall retain jurisdiction over the Liquidating Trust,

13   including but not limited to the objection to claims.  Debtor is in the process

14   of reviewing all timely filed proofs of claim. After the Effective Date, the

15   authority to object to any Claims, not subject to an objection as of the

16   Effective Date, shall vest in the Liquidating Trustee. Any such post-

17   Effective Date objections to Disputed Claims must be brought within 120

18   days following the Effective Date, unless otherwise ordered by the Court.

19   Debtor or Liquidating Trust intends to file objections with the Court to all

20   Disputed Claims and to have the Court resolve all such disputes unless

21   Debtor and the claimants can reach consensual resolution. Disputed

22   Administrative Claims that become allowed after the Effective Date shall be

23   paid in the ordinary course of business in accordance with the terms and

24   conditions of any controlling agreements, course of dealing, course of

25   business, or industry practice. Disputed Claims which are Priority Tax

26   Claims that become allowed after the Effective Date shall be paid in

27   accordance with Section 2.2 of the Plan.

28

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

10.    **Exemption from Transfer Taxes.**    Pursuant to Section 1146(a) of the Bankruptcy Code, Section 11923 of the California Revenue and Tax Code and Section 21.9.6 of the Los Angeles Municipal Code, the Sale, and any other transfer from Debtor to any Entity pursuant to, in contemplation of, or in connection with the Plan shall not be subject to any Stamp or Similar Tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  For the avoidance of doubt, transfer tax shall include, but not limited to, documentary transfer tax pursuant to Cal. Rev. & Tax. Code ("R&T") §11911 (West).  ("County Tax"); Base City Tax pursuant to Los Angeles Municipal Code ("LAMC") § 21.9.2(a); or, ULA Tax (e.g. Mansion Tax) under LAMC § 21.9.2(b).  *See also Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47, 128 S. Ct. 2326, 2336, 171 L. Ed. 2d 203 (2008) ("the decision whether to transfer a given asset "under a plan confirmed" must be made prior to submitting the Chapter 11 plan to the bankruptcy court, but the transfer itself cannot be "under a plan confirmed" until the court confirms the plan in question. Only at that point does the transfer become eligible for the stamp-tax exemption"); *In re New 118th, Inc.*, 398 B.R. 791, 797 (Bankr. S.D.N.Y. 2009) (Stamp tax exemption applies to post-confirmation transfer of property of Chapter 11 estate that follows a preconfirmation sale if it is necessary to consummation of plan.)

11.    **Distributions to Be Made Pursuant to the Plan.**    Except as otherwise provided in this Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Equity Interests Allowed on or before the Effective Date shall be made on the Effective Date; *provided, however*, that: (a) Administrative Claims that are not otherwise paid through the DIP Financing will be paid on or prior to the Effective Date or at such time as the Administrative Claim is allowed by the Court, or as soon as reasonably practicable thereafter (b) allowed Priority Tax Claims, unless otherwise agreed, shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid as may be due and payable under applicable non-bankruptcy Law. If any Distributions are made after the

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

Effective Date, then such distributions shall be made pursuant to Section IV(C)(9), if applicable. Otherwise, the Liquidating Trustee will determine the amount and frequency of distributions in accordance with the Liquidating Trust Agreement.

In the event that following the Auction, the expected Sale Proceeds are insufficient to pay Administrative Claims in full, or if the sale of the Property does not close, Debtor will not seek confirmation of the Liquidating Chapter 11 Plan.

"Unclaimed Property" means any distribution of cash or any other property made to the holder of an allowed claim pursuant to the Plan that (a) is returned to the Liquidating Trustee as undeliverable and no appropriate forwarding address is received within the later of (i) 90 days after the Effective Date and (ii) 90 days after such attempted distribution by the Liquidating Trustee is made to such holder or (b) in the case of a distribution made in the form of a check, is not negotiated within 90 days and no request for re-issuance is made. Unclaimed Property shall be donated to the American Bankruptcy Institute Endowment Fund, a not-for-profit, non-religious organization dedicated to, among other things, promoting research and scholarship in the area of insolvency.

12.     **Injunctions.**  The Confirmation Order will enjoin the prosecution, whether directly, derivatively, or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, discharged or terminated pursuant to this Plan. Except as provided in the Plan or the Confirmation Order, all entities that have held, currently hold, or may hold a claim or other debt or liability that is discharged or an interest or other right of an equity security holder are permanently enjoined from taking any of the following actions against Debtor, Liquidating Trustee, or any of their property on account of such discharged claims, debts or liabilities or extinguished interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to Debtor; and (v) commencing or continuing any action in any manner, in any place, that does not comply with or is inconsistent with the provisions of this Plan.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

By accepting a distribution pursuant to this Plan, each holder of an allowed claim shall be deemed to have specifically consented to the injunctions set forth in this Section.

13. **Exculpation.** Except as otherwise specifically provided for in the Plan, (i) the Debtor; (ii) all officers, directors, and members of the Debtor in each case who are or were acting in such capacity on or after the Petition Date, (iii) all agents, attorneys, advisors, accountants, financial advisors, consultants and other professionals to the extent such parties are or were acting in any such capacity for the parties identified above on or after the Petition Date (each a "Exculpated Party") shall not have or incur any liability for, and each Exculpated Party is hereby exculpated from, any cause of action for any claim related to any act or omission from the Petition Date to the Effective Date in connection with, relating to, or arising out of, Debtor's Chapter 11 Case, in whole or in part, the formulation, preparation, dissemination, and negotiation of this Plan, the Disclosure Statement, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of this Chapter 11 case, the pursuit of Plan confirmation, the administration and implementation of this Plan, the distribution of payments made under this Plan or any related act, except for claims or causes of action arising from an act or omission that is judicially determined in a final non-appealable order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Party shall be entitled to the fullest extent permitted by law to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. Each Exculpated Party has, and upon the consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to this Plan and therefore, are not, and on account of such distributions shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan. For the avoidance of doubt, nothing in this section shall prevent any party in interest from objecting to any Intercompany Loan Claim.

14. **Executory Contracts and Unexpired Leases.** All Executory Contracts and Unexpired Leases of Debtor that are not otherwise assumed or rejected will be deemed rejected by

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION

Debtor in accordance with the provisions and requirements of Sections 365 and 1123, other than (i) those that are identified on the Assumption Schedule to be provided in a supplementary schedule that will be provided, five (5) days prior to the deadline for parties in interest to object to the Liquidating Plan (the "Assumption Schedule"); (ii) those that have been previously assumed or rejected pursuant to a Final Order prior to the Effective Date; (iii) those that are the subject of a motion seeking assumption or rejection as of the Effective Date; or (iv) those that are to be accepted pursuant to the terms of the Plan. Each Executory Contract and Unexpired Lease assumed but not assigned to a third party shall be deemed to be assigned to Debtor, and be fully enforceable by, Debtor in accordance with the terms thereof, except as otherwise modified by the provisions of this Plan, or by any order of the Bankruptcy Court.

**ANY COUNTER-PARTY TO ANY OF THE ASSUMED CONTRACTS AND LEASES WHO DOES NOT FILE A TIMELY OBJECTION TO PLAN CONFIRMATION WILL BE DEEMED TO HAVE CONSENTED TO DEBTOR'S ASSERTED CURE AMOUNTS. THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN UNEXPIRED LEASE OR EXECUTORY CONTRACT WHICH IS REJECTED ON THE EFFECTIVE DATE WILL BE THIRTY DAYS AFTER THE EFFECTIVE DATE.**

Debtor has elected to assume the executory contract with Arcadis Inc., the architect for the Project (the "Architect") upon the confirmation of the Plan. The Architect timely filed a Proof of Claim, claim number 28-1 in the amount of $2,411,799.98 (as may be amended, stipulated to, or otherwise established, the "Architect Claim Amount") for architectural services performed in connection with that certain Agreement dated as of May 26, 2014, by and between Tohigh Construction Investment LLC, and RTKL Associates Inc., as amended and supplemented from time to time (the "Architect Agreement").  Debtor's rights to dispute the additional amount of the claim is reserved it Architect's claim is amended to increase the amount of the claim from the amount set forth above.  The amount of any such dispute, if any, shall be reserved and transferred to the Liquidating Trust (the "Potential Architect Reserve").

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

Architect owns the copyright in the Architect's instruments of service (including architectural plans, specifications, designs, associated renderings, and any electronic format thereof including BIM and AutoCAD) (the "Instruments of Service"), which Instruments of Service may not be used in connection with the bidding or sale process without Architect's written consent.

Debtor has elected to assume (or assume and assign) the Architect Agreement and will cure any defaults at closing (less the Potential Architect Reserve) by paying the Architect Claim Amount from Sale Proceeds on the Effective Date. Upon such assumption of the Architect Agreement, including payment of the Architect Cure Amount: (a) Architect shall have no duty to continue to perform under the Architect Agreement (other than as set forth below), (b) Debtor (or an assignee) shall have no obligation to continue to perform under the Architect Agreement post-closing, and (c) Architect shall have no further pre-petition or post-petition rights, title or claims against Debtor or the estate (other than its rights under the Plan, which are expressly preserved, and its rights under any New Architect Agreement, if applicable).

Upon the cure of defaults under the Architecture Agreement as provided for herein, including, without limitation, payment of the Architect Claim Amount less the Potential Architect Reserve, Architect will grant a license to Debtor or a buyer of Debtor's assets if the Architect Agreement is assumed and assigned to such buyer (a "Recipient Party"), which license shall (a) allow such Recipient Party to use Architect's Instruments of Service created before the Petition Date under the Architect Agreement and (b) be subject to the following conditions:

1.      Any use by Debtor or Recipient Party of the Instruments of Service shall be limited to and strictly comply with the permitted uses and other provisions of the Architect Agreement or as otherwise agreed to by Architect in writing.

2.      The license will be limited to the Project, non-exclusive, and subject to the uses and other provisions of the Architect Agreement.

3.      Any Recipient Party must fully indemnify and release the design team from any claims by buyer and/or third parties arising out of any use or modification of the Instruments of Service.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION

4.      All of the design teams' logos and any identifying marks must be removed from the Instruments of Service.

5.      Any subsequent architects must seal/stamp the Instruments of Service and take on responsible charge as the architect of record.

6.      Debtor or any Recipient Party will identify Architect as the design architect.

Any post-petition license fee or agreement for post-petition services ("New Architect Agreement") must be separately negotiated between Architect and any Recipient Party. Architect agrees, however, that it is generally willing to remain as the Architect of record for the project under the following terms and conditions, subject to formal documentation between Architect and buyer:

1.      The other provisions herein relating to Architect's pre-petition claim have been fully complied with, including payment in full of Architect's pre-petition claim as part of the cure provided for above.

2.      Recipient Party reactivates or purchases project-specific professional liability policy reasonably acceptable to Architect.

3.      Recipient Party hires an independent, third-party forensic consultant to review the project and assess the current status of the Project.

4.      Architect and Recipient Party reaching agreement on the scope, schedule, and fees for remaining services.

15.      **Retention of Jurisdiction.**  After confirmation of the Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Court will retain such jurisdiction as is legally permissible including for the following purposes:

(a)      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, nature, validity, amount, or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment and any and all objections to the allowance, classification, priority or amount of Claims or Equity Interests;

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

(b)      Decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)      Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom; (ii) any potential obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) Debtor's or Liquidating Trustee's amendment, modification, or supplement after the Effective Date, pursuant to Article V of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(d)      Ensure that distributions to Holders of Allowed Claims are carried out pursuant to the provisions of the Plan;

(e)      Adjudicate, decide, or resolve any motions, adversary proceedings, any other matters, and any applications involving a Debtor, that may be pending on the Effective Date;

(f)      Adjudicate, decide or resolve any and all matters related to Causes of Action;

(g)      Adjudicate, decide or resolve any and all matters related to Section 1141 of the Bankruptcy Code;

(h)      Resolve any and all avoidance or recovery actions under Sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

(i)      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or Confirmation Order or any Entity's obligations incurred in connection with the Plan or Confirmation Order, including disputes arising under or in connection with any agreements, documents, or instruments executed in connection with the Plan, Assumption Schedule, or Confirmation Order;

(j)      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan or Confirmation Order and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan or the Confirmation Order;

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

32

(k)     Enter and enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(l)     Adjudicate, decide, or resolve matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(m)     Grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code;

(n)     Enforce the injunction and exculpation provisions of the Plan, and issue injunctions, enter and implement orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

(o)     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such, injunctions and other provisions;

(p)     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid;

(q)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(r)     Determine any other matters that may arise in connection with or relate to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection therewith;

(s)     Enter an order or final decree concluding or closing the Chapter 11 Case;

(t)     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

(u)     Consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(v)     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

(w)    Hear and determine all disputes involving the existence, nature, or scope of Debtor's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(x)    Enforce all orders previously entered by the Bankruptcy Court; and

(y)    Hear any other matter not inconsistent with the Bankruptcy Code.

## V.    TAX CONSEQUENCES OF THE PLAN.

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present. Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Internal Revenue Code, as amended (the "Tax Code") embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action. Also, Debtor has not retained any special tax counsel or tax accountant to analyze any tax consequences resulting from the Confirmation of the Plan.

Although Debtor has attempted to structure the Sale in a manner which is exempt from transfer taxes, Debtor anticipates that the closing of the Sale might result in tax liability. Debtor has not performed any detailed analysis of the extent to which, if any, the confirmation of the Plan may have on any tax liability of the estate. Debtor makes no representations regarding the potential tax consequences to creditors or interest holders from the confirmation of or implementation of the Plan. Debtor has no way of knowing the tax basis of the various investments made by creditors or equity. Without that information and without knowing the final sale amount of the property, it is impossible for Debtor to know or estimate the amount of income tax that could become due on a sale. Similarly, various creditors and equity holders may be liable for taxes in foreign jurisdictions, China as just one example. To the extent that creditors or equity are paid less than the amount of their current tax basis in their claim, an incremental tax loss may be recognized upon sale of the

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1  property. Creditors and equity holders are encouraged to consult with their own tax advisors

2  regarding the potential tax effect that could result from a sale of the property.

3  **VI.    CONFIRMATION REQUIREMENTS AND PROCEDURES.**

4  PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

5  SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

6  CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.

7  The following discussion is intended solely for the purpose of alerting readers about basic

8  confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.

9  Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete

10  summary of the law on this topic.

11  **A.    Who May Object.** Any party in interest may object to the confirmation of the Plan,

12  even if such party in interest would not be entitled to vote to accept or reject the Plan.

13  **B.    Who May Vote to Accept or Reject the Plan.** A creditor or interest holder has a

14  right to vote for or against the Plan if that creditor or interest holder has a claim or interest which

15  is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

16  **C.    What is an Allowed Claim or Interest?** As noted above, a creditor or interest

17  holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any timely

18  filed proof of claim or interest will be deemed allowed, unless a party in interest files an objection

19  to the claim or interest. When an objection to a claim or interest is filed, the creditor or interest

20  holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either

21  overrules the objection or allows the claim or interest for voting purposes.

22  THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE ON ACCOUNT

23  OF PRE-PETITION CLAIMS WAS JUNE 26, 2024, FOR NON-GOVERNMENTAL UNITS. The

24  bar date for filing a proof of claim in this case for governmental units is September 7, 2024.  A

25  Claim shall be deemed Allowed solely for purposes of voting on the Plan unless (a) such Claim is

26  scheduled as disputed, contingent or unliquidated and no proof of claim has been timely filed or

27  (b) there is an objection with respect to such claim at least fourteen (14) days prior to the Voting

28

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

Deadline. A motion pursuant to Bankruptcy Rule 3018(a) for temporary allowance of the claim may be filed on or before October 1, 2024, and shall be heard October 7, 2024.

**D.      What is an Impaired Claim or Interest?**

As noted above, an allowed claim or interest has the right to vote only if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

Currently, Debtor believes that all Classes of creditors are impaired and entitled to vote to accept or reject the Plan, except for Class 1. However, Debtor reserves the right to change the treatment of such party to the extent it identifies a Winning Bidder who proposes a Purchase Price sufficient to render a class unimpaired. Parties who dispute Debtor's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that Debtor has incorrectly characterized the class.

**E.      Who is Not Entitled to Vote.**  The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such claims are not placed in classes, and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**F.      Who Can Vote in More Than One Class.**  A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION

the Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

**G.** **Votes Necessary to Confirm the Plan.** If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed below.

**H.** **Votes Necessary for a Class to Accept the Plan.** A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted on the plan, voted in favor of the plan. A class of interests is considered to have "accepted" a plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted on the plan, voted to accept the plan.

**I.** **Treatment of Non-Accepting Classes.** As noted above, even if <u>all</u> impaired classes do not accept the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law. Debtor will ask the Court to confirm the Plan by cramdown on any and all impaired classes that do not vote to accept the Plan. In addition to seeking to confirm the Plan by cramdown, as set forth above.

**J.** **Liquidation Analysis.**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

would receive or retain if Debtor was liquidated under chapter 7 of the Bankruptcy Code. Debtor's Liquidation Analysis is attached as **Exhibit 4**.

In a chapter 7 case, Debtor's assets are usually sold by a chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a chapter 7 liquidation of Debtor. Debtor maintains that this requirement is clearly met. The biggest and most insurmountable issue is that Debtor is only able to operate a sale process for the Property because of the post-petition financing being provided by DTLA Lending LLC. Absent this Chapter 11 case, Debtor anticipates that its principal asset, the Real Property, would either be sold by a Chapter 7 Trustee or one of its secured creditors would obtain relief from the automatic stay and would proceed with a foreclosure sale. In either of these events, the recovery will likely be less than the process proposed by Debtor thought the Plan.

First, through either a sale by a Chapter 7 Trustee or foreclosure sale, any sale to the ultimate purchaser would not be exempt from transfer taxes pursuant to Section 1146(a) of the Bankruptcy Code, Section 11923 of the California Revenue and Tax Code and Section 21.9.6 of the Los Angeles Municipal Code. Second, in the event of a conversion of Debtor's case to chapter 7, a chapter 7 trustee would be appointed and would be completely unfamiliar with the Property and the complexities of this case. The Chapter 7 Trustee would likely hire all new professionals who would be equally unfamiliar with the Property in this Case. The result of all of that would be the incurrence of an extraordinary amount of additional professional fees incurred by professionals who would need to familiarize themselves with this, all of which is avoided by the current professionals, who are skilled, experienced and already intimately familiar with these

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION

cases, continuing with their current roles. Third, the marketing of the Property in the context of a sale by a Chapter 7 Trustee or at a foreclosure sale would be significantly less robust than the marketing plan already implemented by Debtor. Finally, in the event that the Property was sold by the Chapter 7 Trustee, pursuant to section 326 of the Bankruptcy Code, a chapter 7 trustee would be paid a significant amount of money for distributing the funds in these estates. After these costs and expenses, Debtor does not believe that any funds would be available to distribute to holders of unsecured claims following a liquidating of the Property.

In contrast, Debtor projects that Holders of Allowed General Unsecured Claims will receive some distribution pursuant to the Plan, with the prospect for additional upside in the event that the Purchase Price obtained through Debtor's marketing process is higher than estimated. Debtor's projections are based off the progress of its marketing efforts and are subject to revision depending on the amounts provided in the bids it ultimately receivers for the Property.  The Break-Even Analysis sets forth the expected sale price that is needed to make a full distribution on the LA County Tax Claim, and to the DIP Lender, LADI, Lendlease and priority creditors.

This option provides all creditors, including general unsecured creditors, with a vastly higher recovery than they would ever receive if Debtor's case were converted to chapter 7. Moreover, it may take many years for a chapter 7 trustee to administer this case and general unsecured creditors would not receive any distribution during the interim. Debtor, therefore, has satisfied the "best interest of creditors test" with respect to any general unsecured creditors who vote to reject the Plan. Debtor also submits that the Plan provides fair and equitable treatment of all classes of creditors and the greatest feasible recovery to all creditors.

**K.** **Feasibility.**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Debtor.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether Debtor will have enough cash on hand on the Effective Date to pay all the claims and expenses which are entitled to be paid on the Effective Date or shortly thereafter. If a sale of the

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

Property meets or exceeds the price set forth in the Break-Even Analysis, then Debtor anticipates having sufficient Cash as of the Effective Date to pay such claims from the Sale of the Property. If the sale of the Property is lower than the price set forth in the Break-Even Analysis, Debtor will request that its secured creditors provide a carve-out sufficient to allow Debtor to pay all amounts necessary to proceed in confirming the Plan and ask secured creditors to consent to payment of less than the full amount of their unsecured claims. In the event that the Secured Creditor do not consent to a sufficient carve-out, or Debtor is otherwise unable to pay all amounts necessary to have a confirmable plan from the Sale Proceeds, Debtor will not seek confirmation of the Plan. The second aspect considers whether the Reorganized Debtors will have enough cash over the life of the Plan to make the required Plan payments.  Pursuant to the Plan, Debtor has agreed to make payment to each Class depending on the Sale Proceeds obtained through the Sale of the Property. If Debtor does not have sufficient Cash on hand on the Effective Date to pay all of the claims and expenses which are entitled to be paid on the Effective Date or shortly thereafter, Debtor will request that the Holders of Secured Claims agree to a carve-out from their respective claims to pay such expenses. In the event that the Holders of Secured Claims do not agree to such carve-out, the Effective Date will not occur and Debtor will not go forward with the confirmation of this Plan.  If the sale proceeds exceed the break-even sales price, any other post-confirmation activities of the Liquidating Trustee will be funded through Plan Administrative Assets. Debtor, therefore, has satisfied this second aspect of Plan feasibility.

## VII.    RISK FACTORS REGARDING THE PLAN.

As with any sale of property, there is a risk that the ultimate sale price realized will be lower than Debtor anticipates or projects. In this case, the sale of the Property may not close and in that case, Debtor will not seek confirmation of the Liquidating Chapter 11 Plan. Additionally, in the event the parties are unable to close on a sale of the Property with the Winning Bidder or Back-Up Bidder post-confirmation, then there is a possibility that the Effective Date of the Liquidating Chapter 11 Plan will not occur.  There are also a large number of still contingent, unliquidated and disputed claims which will ultimately have to be settled or litigated.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

1  There are also many factors as it relates to the sale of undeveloped property that are

2  outside the control of Debtor.  Based upon the appraisal obtained by Debtor, the discussions that

3  Debtor is having with prospective purchasers of the Property, the amount of interest in the

4  Property, and the opinions of Debtor's Professionals, Debtor believes that there will be a buyer

5  for the Property sufficient to satisfy all Administrative Claims, Secured Claims, and provide at

6  least some return for the Holders of General Unsecured Claims. Debtor also has a reasonable

7  belief there will be a robust auction.

8  **VIII.  EFFECT OF CONFIRMATION OF THE PLAN.**

9  **A.  Discharge.**  Debtor will not receive a discharge under the Plan.

10  **B.  Modification of the Plan.**  Debtor reserves the right to modify the Plan any time

11  before confirmation. However, the Court may require a new disclosure statement and/or re-voting

12  on the Plan if Debtor modifies the Plan before confirmation. The Liquidating Trustee may also seek

13  to modify the Plan at any time after confirmation of the Plan so long as (1) the Plan has not been

14  substantially consummated and (2) the Court authorizes the proposed modification after notice and

15  a hearing.

16  **C.  Post-Confirmation Status Reports.**  Until a final decree closing Debtor's Case is

17  entered, the Liquidating Trustee will file quarterly status reports with the Court explaining what

18  progress has been made toward consummation of the confirmed Plan.

19  **D.  Post-Confirmation Conversion/Dismissal.**  A creditor or any other party in interest

20  may bring a motion to convert or dismiss these chapter 11 cases under Section 1112(b) of the

21  Bankruptcy Code after the Plan is confirmed if there is a default in performing the Plan. If the Court

22  orders these chapter 11 cases converted to chapter 7 after the Plan is confirmed, then all property

23  that had been property of these chapter 11 estates, and that has not been disbursed pursuant to the

24  Plan, will revest in the chapter 7 estates, and the automatic stay will be reimposed upon the revested

25  property, but only to the extent that relief from stay was not previously authorized by the Court

26  during these cases. The Confirmation Order may also be revoked under very limited circumstances.

27  The Court may revoke the Plan Confirmation Order if it was procured by fraud and if a party in

28

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING
PLAN OF REORGANIZATION

interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Confirmation Order.

E.    **Final Decree.**  Once Debtor's estate has been fully administered as referred to in Bankruptcy Rule 3022, the Liquidating Trustee will file a motion with the Court to obtain a final decree to close this chapter 11 case. The Liquidating Trustee will be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. Section 1930(a)(6) as well as any and all other fees owing to the U.S. Trustee and/or the Clerk of the Court.

Dated: September 6, 2024                    Respectfully submitted,

                                            BRYAN CAVE LEIGHTON PAISNER LLP

                                            By: _/s/ Sharon Z. Weiss_____
                                                    Sharon Z. Weiss
                                            Attorneys for Debtor-in-Possession

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S LIQUIDATING PLAN OF REORGANIZATION

# EXHIBIT 1



# EXHIBIT 2

**Oceanwide Plaza LLC**

**Exhibit 2**

| Creditors | Debtor's Claim Estimate Based on Schedules | | | Filed Proof of Claims | | |
|---|---|---|---|---|---|---|
| | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount |
| ACCO Engineered Systems, Inc. | $16,815,623.00 | | | $18,898,044.00 | | |
| ACCO Engineered Systems, Inc. | | | $1,102,224.32 | | | $533,122.00 |
| ACCO Engineered Systems, Inc. | | | $2,615,543.00 | | | |
| Addison Pools | | | $38,848.00 | | | $279,712.00 |
| Adobe, Inc. | | | $575.76 | | | |
| Advanced Equipment Corporation | | | $1,800.00 | | | $1,800.00 |
| Aesthetic Maintenance Corporation | | | $276,898.65 | | | |
| AIG Property Casualty, Inc. | | | | | | $252,500.00 |
| Alamillo Rebar Inc. [Webcor Sub] | $8,282,161.53 | | | | | |
| American Contractors Indemnity Company | | | | Unknown | | Unknown |
| American Stair | $731,322.00 | | | | | |
| American Stair Corporation, Inc. | | | | $955,728.00 | | |
| Asia-Pacific Property & Casualty Insurance | | | $86,972.60 | | | |
| ASSI Security | | | $135.00 | | | |
| AT&T | | | $1,283.54 | | | |
| Bapko [Elevator Divider Beams - Sub-K #1720] | $173,004.00 | | | Withdrawn | | Withdrawn |
| Bapko [Misc. Metals and Struct. Steel - Sub-K #1750] | $3,370,650.00 | | | $3,543,654.00 | | |
| Beaubois | | | Undetermined | | | |
| Beaubois (T1) | | | $1,633,732.00 | | | |
| Beaubois (T2) | | | $1,042,204.00 | | | |
| Bigge Crane & Rigging Co. | | | $2,885,694.80 | $1,612,313.20 | | $2,324,016.38 |
| Bragg Investment Co., Inc. | $2,792,381.49 | | $3,052,970.89 | $5,845,352.38 | | |
| Brandsafway Services, LLC | | | $400,133.25 | | | $465,776.86 |
| Calex | | | $9,399.00 | | | $9,399.00 |
| California Benefit Planners | | | $900.00 | | | $4,695.00 |
| California Community Foundation | | | $100,000.00 | | | $300,000.00 |
| CallisonRTKL | $8,035.00 | | | | | |
| CallisonRTKL Inc. [Direct Contractor] | $1,613,530.62 | | | $1,613,530.62 | | $798,269.36 |
| Carrara, Inc. | | | $1,537,637.00 | $1,147,913.69 | | $1,705,279.16 |
| CCC Investment Group, Inc | | | $40,000.00 | | | |
| CDC Curtain Wall Design and Consulting | | | $11,561.68 | | | |
| Central City Association of Los Angeles | | | $16,000.00 | | | |
| Chao Wang | | | Unliquidated | | | $1,500,000.00 |
| Chen & Fan Accountancy Corporation | | | $33,137.26 | | | |
| Chicago Title Insurance Company | | | Unliquidated | | | $10,680,666.19 |
| Chubb | | | $270,000.00 | | | |
| Chute Systems | | | $55,405.00 | $56,035.00 | | |
| City of LA - Building and Safety | | | $356.10 | | | |
| City of LA Bureau of Street Services | | | $22,996.89 | | | |
| Cleveland Marble | | | $72,000.00 | | | $72,000.00 |
| Cleveland Marble | | | Undetermined | | | |
| CMF Inc. | $5,898,994.00 | | $478,592.00 | $6,067,586.00 | | |
| CNA Surety | | | $158,440.00 | | | |
| Commercial Scaffolding of California Inc. | | | $2,683,505.23 | $2,711,442.86 | | |
| Compass, Inc. | | | $170,807.19 | | | |
| Continental Marble & Tile Co. | $2,533,326.00 | | | | | |
| Continental Marble and Tile Company | | | $845,635.00 | | | |
| County of Los Angeles | | $3,066.53 | | | | |
| Creditors Adjustment Bureau, Inc. (as assignee of CNA Surety) | | | | | | $178,103.20 |

**Oceanwide Plaza LLC**

**Exhibit 2**

| Creditors | Debtor's Claim Estimate Based on Schedules | | | Filed Proof of Claims | | |
|---|---|---|---|---|---|---|
| | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount |
| Crisp Imaging | | | $20,700.00 | | | |
| CSC | | | $868.00 | | | |
| DAG Tech LLC | | | $540.00 | | | $540.00 |
| Daniel A. Cantor | | $15,150.00 | $7,425.06 | | $15,150.00 | $59,459.37 |
| Department of Treasury - Internal Revenue Service | | $101,911.91 | | | $317,245.80 | $59,715.82 |
| Diane Chang | | | $2,322.17 | | | $7,590.59 |
| DSM Construction, Inc. | | | $5,698.00 | | | |
| Eberhard | | | $17,858.00 | | | $22,817.00 |
| EES Security [EES Security] | | | | | | $1,677,899.36 |
| Employers Preferred Insurance Co. | | | $5,267.00 | | | |
| Enclos | $5,950,000.00 | | | $5,950,000.00 | | |
| Ernst & Young LLP | | | $77,000.00 | | | |
| Executive Event Services | | | $1,441,570.58 | | | |
| Fetzers' Inc. | $2,001,694.00 | | $650,000.00 | $1,992,748.33 | | $218,513.67 |
| Ficcadenti Waggoner and Castle | | | $28,600.00 | | | |
| FPL and Associates, Inc. | | | $3,976.00 | | | $24,236.00 |
| Franchise Tax Board | | | $3,200.00 | | $1,613.91 | $52.00 |
| Galstian Consulting Group, Inc. | | | $8,500.00 | | | |
| Geotechnologies, Inc. | | | $11,696.00 | | | $11,696.00 |
| Gregory Mowbray | | $15,150.00 | $2,562.39 | | $15,150.00 | $115,551.88 |
| Ground Penetrating Radar Systems, LLC (GPRS) | | | $6,000.00 | | | |
| Hancock S-REIT LA Corp. | | | $945,890.09 | | | $952,498.79 |
| Hong Ye (Bill) Zhang | | | $34,400.42 | | | |
| Hyatt Corporation | | | $11,619.63 | | | |
| Illinois Union Insurance Company | | | | | | $270,000.00 |
| J T Wimsatt Contracting Co., Inc. | | | | $9,329,159.79 | | |
| Jaqueline Hurwitz | | | Unliquidated | | | |
| Johnson & Turner Painting Company, Inc. (T1) | | | $2,198.00 | | | $2,198.66 |
| Johnson & Turner Painting Company, Inc. (T2 & T3) | | | $45,325.00 | | | $45,325.51 |
| Johnson Controls Fire Protection LP aka TYCO aka Simplex Grinnell | $1,383,546.00 | | | $1,383,547.00 | | |
| JPMorgan Chase Bank N.A. | | | $112,994.69 | | | |
| JSS Construction, Inc | | | $141,702.00 | | | $631,613.67 |
| JT Wimsatt | $4,049,373.00 | | | | | |
| Justin Tsai | | | | | | $3,349.32 |
| Karcher Interior Systems, Inc. [ACCO Sub] | $397,945.73 | | | | | |
| Karcher Interior Systems, Inc. [Martin Bros. Sub] | $261,850.00 | | | | | |
| KCJ Engineering Inc. | | | $5,420.00 | | | |
| Kember | | | Undetermined | | | |
| Kember Flooring Inc. | | | $264,091.00 | | | |
| Ken W. Choi | | $15,150.00 | $1,250.55 | | $24,621.47 | $33,353.31 |
| Kimberly E. Frascarelli | | | $688.35 | | | $2,664.85 |
| King Choi | | | $1,557.72 | | | $4,807.69 |
| Kovach Enclosure Systems LLC [Kovach Building Enclosures] | | | $1,652,713.00 | $1,469,913.00 | | $152,800.00 |
| KPFF | | | $8,940.60 | | | $11,757.73 |
| L.A. Downtown Investment, LP | $164,009,111.95 | | | Up to 325 million | | Any portion of the claim that is less than et al. |
| La Jolla Pacific of California, LTD. | | | $2,825.00 | | | |
| Larry Methvin Installations, Inc. | | | $313,410.00 | | | |
| Larry Methvin Installations, Inc. (T1) | | | $758,385.00 | | | |

**Oceanwide Plaza LLC**

**Exhibit 2**

| Creditors | Debtor's Claim Estimate Based on Schedules | | | Filed Proof of Claims | | |
|---|---|---|---|---|---|---|
| | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount |
| Larry Methvin Installations, Inc. (T2 & T3)) | | | $148,308.00 | | | |
| Lendlease (US) Construction Inc. | | | | | | $171,555,704.08 |
| Lendlease (US) Construction Inc. | | | | $171,555,704.08 | | |
| Lendlease (US) Construction Inc. | | | | $51,000,000.00 | | |
| Lendlease (US) Construction Inc. | | | | $3,850,000.00 | | |
| Lendlease (US) Construction Inc. | | | | | | $14,000,000.00 |
| Lendlease (US) Construction Inc. | | | | | | $118,970,474.00 |
| Lendlease (US) Construction Inc. | | | | | | $2,512,743.00 |
| Lendlease (US) Construction Inc. (Prejudgment Interest) | | | $2,512,743.00 | | | |
| Lendlease (US) Construction Inc. (Prompt Payment Penalties) | | | $122,332,400.00 | | | |
| LendLease (US) Construction, Inc. | $465,494.23 | | | | | |
| LendLease (US) Construction, Inc. | $4,574,552.85 | | | | | |
| LendLease (US) Construction, Inc. | $7,954,092.69 | | | | | |
| LendLease (US) Construction, Inc. | $10,321,220.00 | | | | | |
| Lexington Insurance Co. | | | $252,000.00 | | | |
| Lexis Nexis | | | $1,250.00 | | | |
| Lincoln Financial Group | | | $3,703.72 | | | |
| Littler Mendelson | | | $2,837.80 | | | |
| Los Angeles County Tax Collector | $18,463,711.62 | | | $27,538,766.83 | | |
| Los Angeles Department of Water and Power | | | $720,713.80 | | | |
| Los Angeles Police Department | | | $24.00 | | | |
| Malone Bailey, LLP | | | $3,000.00 | | | |
| Marsh USA Inc | | | $891,092.25 | | | |
| Martin Bros. & Marcowall, Inc. | $3,871,200.00 | | $102,665.21 | $3,871,200.00 | | $106,640.00 |
| McCormick & Associates, Inc. | | | $5,000.00 | | | |
| Michael J. Bayard, Esq. | | | $74,062.50 | | | |
| Mitsubishi Electric US, Inc. | $4,176,625.00 | | $637,508.00 | $4,176,625.00 | | $637,508.00 |
| Morrow Equipment Company, LLC | $997,245.16 | | $2,255,520.96 | $3,252,766.12 | | $66,461.02 |
| MS Rousse | | | $851,726.00 | | | |
| Navigators Insurance Co. | | | $92,500.00 | | | $92,500.00 |
| Neil Yu | | | $756.33 | | | $6,075.63 |
| Nevell Group Inc. | $2,900,241.00 | | | | | |
| Nixon Peabody | | | ($25,937.98) | | | |
| Ocean Food Services, Inc. | | | $10,689.95 | | | |
| Ocean Food Services, Inc. | | | $31,590.00 | | | |
| Oceanwide Investment Three (Hungary) Kft Fa. [Oceanwide Investment Three (Hungary) LLC] | | | $52,112,634.43 | | | $52,239,710.09 |
| Oceanwide Plaza I LLC | | | $355,276.76 | | | |
| Oceanwide Real Estate Group (USA) Corp. | | | $167,225,590.60 | | | $169,301,076.71 |
| Pacific Building Specialties | | | $21,295.00 | | | $21,294.72 |
| Pan Pacific Plumbing & Mechanical, LLC | $6,775,430.00 | | | $6,775,429.00 | | |
| Paychex | | | $221,231.44 | | | |
| PayScale | | | $1,600.00 | | | |
| PeopleReady, Inc. | | | $1,575.84 | | | |
| Pierre Landscape Inc. | | | $53,420.00 | | | |
| Poggenpohl US Inc. | | | $105,712.00 | | | |
| Project Approval Service | | | $5,500.00 | | | |
| Pro-Vigil, Inc. | | | $53,356.64 | | | |

**Oceanwide Plaza LLC**

**Exhibit 2**

| Creditors | Debtor's Claim Estimate Based on Schedules | | | Filed Proof of Claims | | |
|---|---|---|---|---|---|---|
| | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount |
| Psomas | | | $203.00 | | | $1,417.59 |
| Public Storage | | | $490.00 | | | |
| Pure Water of Los Angeles | | | $120.45 | | | |
| PWC | | | $2,500.00 | | | |
| PwC US TAX LLP | | | $375.00 | | | |
| Quality Assurance Engineering, Inc. [dba Consolidated Engineering Laboratories] | | | | $43,146.92 | | |
| Ralls Gruber & Niece LLP | | | $906,313.60 | | | $906,314.00 |
| Registrar-Recorder/County Clerk | | | $16.00 | | | |
| Ren Zhou | | | Unliquidated | | | $1,500,000.00 |
| RentYourPlants | | | $458.00 | | | $458.00 |
| Repeated Signal Solutions, Inc. | | | $17,789.00 | | | |
| Ricoh USA Inc | | | $66.00 | | | |
| Rynoclad | | | Undetermined | | | |
| Rynoclad Technologies Inc. | | | $1,188,187.00 | | | |
| SASCO | $17,823,795.40 | | $818,000.00 | $17,448,378.00 | | $818,000.00 |
| Schuff Steel Co. | $4,615,000.00 | | $672,000.00 | $5,628,595.32 | | |
| Seamless Care Inc. | | | $319,957.00 | | | |
| Sequent Systems | | | $2,000.00 | | | $10,100.00 |
| Sharpe Interior Systems, Inc. | $3,850,000.00 | | | | | |
| Smith-Emery Laboratories, Inc. | | | $7,087.00 | | | |
| SoCal Sanitation | | | $970.65 | | | |
| Song (Thomas) Feng | | $15,150.00 | $182,865.50 | | $24,761.34 | $235,286.02 |
| Standard Drywall, Inc. | $1,297,552.20 | | $1,091,790.61 | $1,168,118.00 | | $683,385.00 |
| Star Hardware, Inc. | $1,596,331.00 | | $783,332.30 | $1,915,993.00 | | $456,420.71 |
| State of California | | $800.00 | | | | |
| State of California | | $38,237.33 | | | | |
| State of Delaware | | | $6,870.48 | | | |
| State of Delaware | | $882.50 | | | | |
| State Water Resources Control Board | | | $756.00 | | | |
| Steel Blue LLC | | | $5,000.00 | | | |
| Stone Etc., Inc. | | | $1,051,942.00 | | | |
| Stone Etc., Inc. | | | $1,029,819.00 | | | |
| Stone Etc., Inc. Deposit | | | $100,000.00 | | | |
| Suffolk Construction Company, Inc. | | | $25,000.00 | | | |
| Sunhouse Hospitality LLC | | | $7,448.17 | $7,449.00 | | |
| Swinerton Inc. dba Swinerton Management and Consulting | | | $761,505.82 | | | |
| Swinerton-Webcor Joint Venture | | | $554,225.28 | | | |
| Terra - Petra | | | $10,899.00 | | | |
| The Concord Group, LLC | | | $13,500.00 | | | |
| The Kenrich Group LLC | | | $114,011.50 | | | |
| The MS Rouse Company, Inc. (T1) | | | $1,771,386.00 | | | |
| Tom Malloy Corp. dba Trench Shoring | | | $392,673.40 | | | |
| Tractel Ltd. | $1,229,944.88 | | | $1,279,944.88 | | |
| Tractel Ltd. | | | | $1,179,944.88 | | |
| Tractel Ltd. | | | $627,644.00 | | | $710,200.24 |
| TransAmerica | | | $34,910.82 | | | |
| TriNet | | | $1,725.00 | | | |
| Turner & Townsend Inc | | | | | | Blank |

**Oceanwide Plaza LLC**

**Exhibit 2**

| Creditors | Debtor's Claim Estimate Based on Schedules | | | Filed Proof of Claims | | |
|---|---|---|---|---|---|---|
| | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount | Secured Claim Amount | Priority Claim Amount | General Unsecured Claim Amount |
| Turner & Townsend Inc | | | $240,745.68 | | | $240,746.00 |
| Twining | | | $100,897.60 | | | $325,630.99 |
| U.S. Specialty Insurance Co. | | | $41,320.00 | | | |
| United Valet Parking Inc | | | $810.00 | | | |
| Vigen Onany & Associates | | | $8,095.00 | | | |
| Vision Communications Co [Khavarian Enteprises Inc.] | | | $6,221.01 | | | $8,158.41 |
| Webcor Construction, L.P., dba Webcor Builders | $51,000,000.00 | | | | | |
| Western Surety | | | $158,440.00 | | | |
| Williams New York | | | $179,136.00 | | | |
| Woodbridge Glass Inc. | $4,735,551.40 | | $2,464,448.60 | $7,200,003.00 | | |
| Woodbridge Glass Inc. | | | $670,619.60 | $677,367.00 | | |
| Xerox Financial Services LLC | | | $3,591.68 | | | |
| XL Fire Protection | $1,912,752.56 | | | | | |
| Yanting Dong | | | Unliquidated | | | $1,500,000.00 |
| YESCO LLC | $868,215.52 | | | $868,216.00 | | |
| YESCO LLC | | | $1,156,901.38 | | | $1,156,901.23 |
| Yichen Zhou | | | Unliquidated | | | $1,500,000.00 |
| Yiyang Zhou | | | Unliquidated | | | $1,500,000.00 |
| Zinner Consultants | | | $8,378.75 | | | |
| **Total** | **$368,471,558.95** | **$205,498.27** | **$396,077,316.42** | **$372,014,614.90** | **$398,542.52** | **$564,476,985.81** |

# EXHIBIT 3

**Oceanwide Plaza LLC**

**Breakeven Under Chapter 11 Plan**

**Scheduled Claim Amount**

| Senior Secured Loan Plus Tax | | |
|---|---|---|
| LADI as of Petition | $ | 180,424,262 |
| LADI Interest Additional | $ | 12,901,571 |
| **LADI Total** | **$** | **193,325,833** |
| | | |
| Lendlease | $ | 172,000,000 |
| | | |
| Third Tier Liens | $ | 15,266,405 |
| Property Tax | $ | 21,176,844 |
| Property Tax Additional | $ | 2,600,000 estimate [1] |
| Architect Cure Cost | $ | 2,500,000 |
| **Total Other** | **$** | **213,543,249** |
| | | |
| DIP estimate through Oct 31. | $ | 12,868,852 [2] |
| | | |
| **Total Secured** | **$** | **419,737,934** |

| Unsecured | | |
|---|---|---|
| Priority | $ | 205,498 |
| Non Priority (Non-Related) | $ | 176,189,712 |
| Non Priority (Related Parties) | $ | 219,693,502 |
| **Total Unsecured** | **$** | **396,088,712** |

| Closing & Other Costs | | | |
|---|---|---|---|
| Cost of Sale | $ | 15,231,109 | 3.5% |

| Distribution | | |
|---|---|---|
| Sales Price | $ | 435,174,541 |
| DIP | $ | 12,868,852 |
| Selling Expense | $ | 15,231,109 |
| **Proceeds for Distribution** | **$** | **407,074,580** |

| | Distribution $ | Recovery % |
|---|---|---|
| **Distribution:** | | |
| LADI | $  193,325,833 | 100% |
| Lendlease | $  172,000,000 | 100% |
| Property Tax | $  23,776,844 | 100% |
| Third Tier Liens | $  15,266,405 | 100% |
| Priority Unsecured | $  205,498 | 100% |
| Architect Cure Cost | $  2,500,000 | 100% |
| **Total** | **$  407,074,580** | |
| | | |
| **Funds Available for Non Priority Unsecured** | **$          -** | |
| | | |
| Non Priority (Non-Related) | $          - | 0% |
| Non Priority (Related Parties) | $          - | 0% |
| **Total Non Priority Unsecured** | **$          -** | |
| | | |
| **Total Payment to Creditors** | **$  407,074,580** | |

[1] Property tax is an estimate for the December payment for 2024 to 2025 tax year. This amount could be prorated.
[2] DIP is based on proposed revised 12/31/2024 DIP budget.

# EXHIBIT 4

**Oceanwide Plaza LLC**
**Breakeven Under Chapter 7 Trustee**

| Scheduled Claim Amount | | | | | |
|---|---|---|---|---|---|
| **Senior Secured Loan Plus Tax** | | | | | |
| LADI as of Petition | $ | 180,424,262 | | | |
| LADI Interest Additional | $ | 12,901,571 | | | |
| **LADI Total** | **$** | **193,325,833** | | | |
| | | | | | |
| Lendlease | $ | 172,000,000 | | | |
| Lendlease Accruing Int/Penalty | | | | | |
| Third Tier Liens | $ | 15,266,405 | | | |
| Property Tax | $ | 21,176,844 | | | |
| Property Tax Additional | $ | 2,600,000 | estimate | | [1] |
| Architect Cure Cost | $ | 2,500,000 | | | |
| **Total Other** | **$** | **213,543,249** | | | |
| | | | | | |
| CH 7 Trustee Fees | $ | 12,593,028 | 3.0% | | |
| | | | | | |
| **Total Secured** | **$** | **419,462,110** | | | |

| | Unsecured | | | Break Even Price $ | 464,139,328 |
|---|---|---|---|---|---|
| Priority | $ | 205,498 | | Petition Date | 2/13/2024 |
| Non Priority (Non-Related) | $ | 176,189,712 | | Closing Date | 10/31/2024 |
| Non Priority (Related Parties) | $ | 219,693,502 | | Effective Date | 12/31/2024 |
| **Total Unsecured** | **$** | **176,395,210** | | | |

| | Closing & Other Costs | | | |
|---|---|---|---|---|
| Cost of Sale | $ | 16,244,876 | 3.5% |
| LA City ULA Mansion Tax | $ | 25,527,663 | 5.5% |
| LA County Transfer Tax | $ | 510,553 | 0.1% |
| LA City Transfer Tax | $ | 2,088,627 | 0.5% |

| Distribution | | |
|---|---|---|
| Sales Price | $ | 464,139,328 |
| CH 7 Trustee Fees | $ | 12,593,028 |
| Selling Expense | $ | 44,371,720 |
| **Proceeds for Distribution** | **$** | **407,174,580** |

| | Distribution $ | Recovery % |
|---|---|---|
| **Distribution:** | | |
| LADI | $ 193,325,833 | 100% |
| Lendlease | $ 172,000,000 | 100% |
| Property Tax | $ 23,776,844 | 100% |
| Third Tier Liens | $ 15,266,405 | 100% |
| Priority Unsecured | $ 205,498 | 100% |
| Architect Cure Cost | $ 2,600,000 | |
| **Total** | **$ 407,174,580** | |
| | | |
| **Funds Available for Non Priority Unsecured** | **$ -** | |
| | | |
| Non Priority (Non-Related) | $ - | 0% |
| Non Priority (Related Parties) | $ - | 0% |
| **Total Non Priority Unsecured** | **$ -** | |
| | | |
| **Total Payment to Creditors** | **$ 407,174,580** | |

[1] Property tax is an estimate for the December payment for 2024 to 2025 tax year. This amount could be prorated.
[2] DIP is based on proposed revised 12/31/2024 DIP budget.